**PLANNED PARENTHOOD FEDERA-
TION OF AMERICA, Planned Parent-
hood of the Rocky Mountains, Planned
Parenthood Association of Utah, Boul-
der Valley Women's Health Center,
Marilyn Foelski, M.D., Philip Freed-
man, M.D., and Kirtly Jones, M.D.,
Plaintiffs,**

v.

**Otis BOWEN, M.D., individually and in
his capacity as Secretary of the United
States Department of Health and Hu-
man Services, Defendant.**

Civ. A. No. 88–Z–158.

United States District Court,
D. Colorado.

Feb. 25, 1988.

**1466**

James W. Hubbell, Kelly/Haglund/Garnsey & Kahn, Denver, Colo., Roger K. Evans, Dara Klassel, Beth Otten, Planned Parenthood Federation of America, Inc., New York City, for plaintiffs; Jeffrey R. Oritt, Tibbals, Howell, Jones & Moxley, Salt Lake City, Utah, Howard Holme, Fairfield & Woods, Denver, Colo., of counsel.

Chalk Mitchell, Asst. U.S. Atty., Denver, Colo., Robert J. Cynkar, Thomas Millet, Federal Programs Branch, Civ. Div., Dept. of Justice, Washington, D.C., for defendant.

## ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

WEINSHIENK, District Judge.

The matter is before the Court on plaintiffs' Motion For Preliminary Injunction pursuant to Fed.R.Civ.P. 65. The action arises out of defendant's recent promulgation of regulations governing the activities of entities receiving funds for family planning services under Title X of the Public Health Service Act, 42 U.S.C. §§ 300–300a-6a. In their complaint and motion for preliminary injunctive relief, plaintiffs contend that the regulations in question are invalid because they exceed statutory authority, are arbitrary and capricious, and are unconstitutional. For the reasons stated below, the Court is satisfied that plaintiffs have a substantial likelihood of success on the merits and have shown irreparable injury. Based on these and other findings, the Court concludes that a Preliminary Injunction is appropriate, which will delay the effective date of the regulations until the Court conducts a hearing on the merits.

Congress passed Title X of the Public Health Service Act, 42 U.S.C. §§ 300–300a-6a, in 1970. Section 1008 of Title X, which forms the basis of the present controversy, provides: "None of the funds appropriated under this subchapter shall be used in programs where abortion is a method of family planning." 42 U.S.C. § 300a-6 (1970) (hereinafter "§ 1008"). Initially, defendant interpreted § 1008 through a series of legal opinions issued by its Office of General Counsel (OGC). Thereafter, in 1976 and 1981, defendant issued Program Guidelines for Title X projects. These opinions and guidelines are discussed in greater detail below. On February 2, 1988, defendant promulgated the final regulations relating to compliance with § 1008 which form the basis of the present controversy. 53 Fed. Reg. 2922–2946 (Feb. 2 1988).[1]

---

1. The regulations in question provide:

**§ 59.7 Standards of compliance with prohibition on abortion.**

A project may not receive funds under this subpart unless it provides assurance satisfactory to the Secretary that it does not include abortion as a method of family planning. Such assurance must include, at a minimum, representations (supported by such documentation as the Secretary may request) as to compliance with each of the requirements in § 59.8 through § 59.10. A project must comply with such requirements at all times during the period for which support under Title X is provided.
53 Fed.Reg 2944–45 (Feb. 2, 1988) (to be codified at 42 C.F.R. 59.7 (1988).

**§ 59.8 Prohibition on counseling and referral for abortion services; limitation of program services to family planning.**

(a)(1) a Title X project may not provide counseling concerning the use of abortion as a method of family planning or provide referral for abortion as a method of family planning. (2) Because Title X funds are intended for family planning, once a client served by a Title X project is diagnosed as pregnant, she must be referred for appropriate prenatal and/or social services by furnishing a list of available providers that promote the welfare of mother and unborn child. She must also be provided with information necessary to protect the health of mother and unborn child until such time as the referral appointment is kept. In cases in which emergency care is required, however, the Title X project shall be required only to refer the client immediately to an appropriate provider of emergency medical services. (3) A Title X project may not use prenatal, social service or emergency medical or other

*Standard For Issuance Of A Preliminary Injunction*

In order for the Court to issue a preliminary injunction, plaintiffs must satisfy the four elements set forth in *Lundgrin v. Claytor*, 619 F.2d 61 (10th Cir.1980). Specifically, plaintiffs must establish that (1) there is a substantial likelihood that they will eventually prevail on the merits; (2) they will suffer irreparable injury unless the Court issues the injunction; (3) their threatened injury outweighs whatever damage the proposed injunction may cause defendant; and (4) the injunction, if issued, would not be adverse to the public interest. *Id.* at 63.

*Substantial Likelihood of Success on the Merits*

Plaintiffs must demonstrate *inter alia* a substantial likelihood of success on the merits before the Court can issue a preliminary injunction. To satisfy their burden in this regard, plaintiffs advance three separate theories to support their contention that the regulations in question are invalid. First, plaintiffs argue that Title X and, specifically, § 1008 do not authorize said regulations. Second, plaintiffs contend that the regulations violate the Administrative Procedure Act, 5 U.S.C. § 706 (1977), because they are arbitrary and capricious. Finally, plaintiffs assert that the regulations are unconstitutional. For reasons stated herein, the Court finds that neither Title X nor § 1008 in particular authorize the regulations at issue, so that plaintiffs have established a substantial likelihood of success on the merits. Accordingly, the Court need not address plaintiffs' second

referrals as an indirect means of encouraging or promoting abortion as a method of family planning, such as by weighing the list of referrals in favor of health care providers which perform abortions, by including on the list of referral providers health care providers whose principal business is the provision of abortions, by excluding available providers who do not provide abortions, or by "steering" clients to providers who offer abortion as a method of family planning.

(4) Nothing in this subpart shall be construed as prohibiting the provision of information to a project client which is medically necessary to assess the risks and benefits of different methods of contraception in the course of selecting a method; *provided*, that the provision of this information does not include counseling with respect to or otherwise promote abortion as a method of family planning.

53 Fed.Reg. 2945 (Feb. 2, 1988) (to be codified at 42 C.F.R. § 59.8 (1988)) (examples omitted).

§ 59.9 **Maintenance of program integrity.**

A Title X project must be organized so that it is physically and financially separate, as determined in accordance with the review established in this section, from activities which are prohibited under section 1008 of the Act and § 59.8 and 59.10 of these regulations from inclusion in the Title X program. In order to be physically and financially separate, a Title X project must have an objective integrity and independence from prohibited activities. Mere bookkeeping separation of Title X funds from other monies is not sufficient. The Secretary will determine whether such objective integrity and independence exist based on a review of facts and circumstances. Factors relevant to this determination shall include (but are not limited to):

(a) The existence of separate accounting records;

(b) The degree of separation from facilities (*e.g.*, treatment, consultation, examination, and waiting rooms) in which prohibited activities occur and the extent of such prohibited activities;

(c) The existence of separate personnel;

(d) The extent to which signs and other forms of identification of the Title X project are present and signs and material promoting abortion are absent.

53 Fed.Reg. 2945 (Feb. 2, 1988) (to be codified at 42 C.F.R. § 59.9 (1988)).

§ 59.10 **Prohibition on activities that encourage, promote or advocate abortion.**

(a) A Title X project may not encourage, promote or advocate abortion as a method of family planning. This requirement prohibits actions to assist women to obtain abortions or increase the availability or accessibility or accessibility of abortion for family planning purposes. Prohibited actions include the use of Title X project funds for the following:

(1) Lobbying for the passage of legislation to increase in any way the availability of abortion as a method of family planning;

(2) Providing speakers to promote the use of abortion as a method of family planning;

(3) Paying dues to any group that as a significant part of its activities advocates abortion as a method of family planning;

(4) Using legal action to make abortion available in any way as a method of family planning;

(5) Developing or disseminating in any way materials (including printed matter and audiovisual materials) advocating abortion as a method of family planning.

53 Fed.Reg. 2945 (Feb. 2, 1988) (to be codified at 42 C.F.R. § 59.10 (1988)) (examples omitted).

and third theories stated above in resolving this first element of the *Lundgrin* test.

■ Regarding the question of whether defendant lacked or exceeded its statutory authority in enacting the regulations in question, the precise issue is whether Title X and, in particular, § 1008 authorize said regulations.[2] The Court is the "final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear Congressional intent." *Chevron U.S.A. v. National Resources Defense Council*, 467 U.S. 837, 843 n. 9, 104 S.Ct. 2778, 2781 n. 9, 81 L.Ed.2d 694 (1984). Upon careful review of the totality of the circumstances surrounding Congressional enactment of Title X and § 1008, as well as its relevant subsequent history, the Court is convinced that Congress did not authorize defendant to enact regulations which restrict a woman's access to information about abortion.

Analyzing the "totality of the circumstances" does not mean merely looking at an isolated quote from one member of Congress. As the Supreme Court stated in *Consumer Products Safety Commission v. GTE Sylvania*, "the contemporaneous remarks of a single legislator who sponsors a bill are not controlling in analyzing legislative history, ... [and] we do not think that ... an isolated remark [of a Congressman] ... is entitled to much weight." 447 U.S. 102, 118, 100 S.Ct. 2051, 2061, 64 L.Ed. 2d 766 (1980). Accordingly, the Court does not accord much weight to the 1970 statements of Congressman John Dingell, a sponsor of Title X, which defendant cites in both its brief and in the comments accompanying the regulations to support its contention that § 1008 authorizes the regulations at issue. *See* 53 Fed.Reg. 2922–23 (Feb. 2, 1988), *quoting* 116 Cong.Rec. 37375 (1970). Similarly, the Court does not give much weight to Congressman Dingell's October 14, 1987 letter to defendant, cited by

plaintiffs, in which Congressman Dingell attempts to explain his 1970 statement and clarify his understanding of Congressional intent in enacting Title X. Letter from the Hon. John D. Dingell to the Hon. Otis R. Bowen (October 14, 1987), *reprinted in* Plaintiffs' Brief, Appendix at A–1.

The totality of the circumstances which a Court must review to determine whether a statute authorizes questioned regulations consists of the following elements: (1) the language of the statute itself; (2) its contemporaneous legislative history; (3) early and subsequent constructions of the statute by the relevant agency, and (4) relevant subsequent legislation which sheds light on Congressional purpose in enacting the statute. *Consumer Product Safety Commission v. GTE Sylvania*, 447 U.S. 102, 108–120, 100 S.Ct. 2051, 2056–62, 64 L.Ed.2d 766 (1980).

Although the starting point of the Court's analysis, the language of § 1008 itself is not particularly helpful in determining whether § 1008 authorizes the regulations in question. The statute makes no reference to prohibiting either the neutral dissemination of information about abortion or referrals upon request to entities which provide abortions. As a result, the Court must look beyond the language of § 1008 to determine the scope of defendant's statutory authority.

In reviewing the contemporaneous legislative history of Title X, two central themes emerge regarding Congressional intent. First, the contemporaneous legislative history is replete with references to the fact that Congress intended it to be a "comprehensive" program "flexible" in its design. *See e.g.* 1970 U.S.Code Cong. and Admin. News pp. 5068, 5073–74; 116 Cong.Rec. 24094–96 (1970). In addition, the Congressional Declaration of Purpose which accompanies Title X spells out its comprehensive scope. *See* 42 U.S.C. § 300, Congressional

---

**2.** In its brief, defendant erroneously argues that the question presented is whether Title X *requires* abortion counseling and referral. Defendant's Opposition To Plaintiffs' Motion For Preliminary Injunction at 22, 27. The question of whether § 1008 requires abortion counseling and referral is distinct from the question in this

case of whether § 1008 permits defendant to enact regulations which prohibit so-called "non-directive options counseling" as well as referrals to facilities which provide abortions. It appears to this Court that neither Title X nor § 1008 *requires* abortion counseling.

Declaration of Purpose. Also, the Committee Report supporting Title X states that among the components of a successful family planning program are: "(1) Medical services, including consultation, examination, prescription, and *continuing supervision* ... and *referral to other medical services as needed.* (2) *Outreach/followup* system, including patient identification, contact, recruitment, appointment support, followup, and continuing education...." Senate Comm. On Labor And Public Welfare, Title X of the Public Health Service Act of 1970, S.Rep. No. 91–1004, 91st Cong., 2nd Sess., *reprinted in* 116 Cong.Rec. 24096 (1970) (emphasis added), 1970 U.S.Code Cong. and Admin.News p. 5068. The weight of the evidence is that Congress intended Title X to be a broad-based program, designed to accomplish more than simply distribute contraceptives. Admittedly, Congress did not intend for Title X to be a panacea for the entire array of women's health problems; however, Congress certainly intended it to have a broader scope than defendant's interpretation suggests. The regulations simply do not accord with Congress' broad understanding of the breadth of Title X.

The second central theme which emerges from the Court's analysis of the contemporaneous legislative history is that Congress designed Title X to combat the problem of access to family planning services for women with low incomes. The legislative history contains several references to the need to eliminate the then emerging two-tier system of delivery of family planning services by ensuring that no woman is "denied access to family planning assistance because of her economic condition." 1970 U.S.Code Cong. & Admin.News pp. 5068, 5073; *see also* 116 Cong.Rec. 24091–92 (1970). The proposed regulations contravene this legislative purpose by recreating a two-tier system of delivery of family planning services. Women who can afford to pay for family planning services will receive full information, while those low income women who must go to Title X clinics for family planning assistance receive limited information.

Defendant argues that Congress could not have meant § 1008 to permit so-called "nondirective options counseling" because abortion was a criminal act in a majority of states in 1970. As a result, according to defendant, construing § 1008 to permit such counseling ascribes to Congress an intent to permit federal grantees to engage in activities which violated the criminal laws of a majority of states. This argument is unpersuasive for several reasons. First, under the Supremacy Clause, federal law may touch on the question of abortion counseling, notwithstanding state criminal laws prohibiting abortions. Second, state criminal laws prohibiting abortions did not proscribe the mere dissemination of information about abortions. Finally, close analysis of the legislative history indicates that Congress in fact discussed the efficacy and legality of state criminal laws banning abortion, and there was in fact some support in Congress, albeit not majority support, for the legalization of abortion. *See* 116 Cong.Rec. 24097–101 (1970). Thus, although abortion was a criminal act in a majority of states in 1970, the support in Congress for the legalization of abortion is evidence that Congress in enacting Title X was not particularly concerned about the fact that abortion was a criminal offense in a majority of states.

A reviewing court "should respect an agency's contemporaneous construction of its founding statute...." *EEOC v. Associated Dry Goods Corp.,* 449 U.S. 590, 600 n. 17, 101 S.Ct. 817, 823, 66 L.Ed.2d 762 (1981) (hereinafter *Associated Dry Goods* ), *citing Power Reactor Development Company v. International Union Of Electrical, Radio And Machine Workers,* 367 U.S. 396, 81 S.Ct. 1529, 6 L.Ed.2d 924 (1961). "Moreover, such a contemporaneous construction deserves *special deference* when it has remained consistent over a long period of time." *Associated Dry Goods,* 449 U.S. at 600 n. 17, 101 S.Ct. at 823 n. 17, *citing Trafficante v. Metropolitan Life Insurance Co.,* 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972) (emphasis supplied). Careful analysis of the history of defendant's administrative interpretations of Title X provides further support

for the Court's conclusion that § 1008 does not authorize the regulations in question.

Defendant's[3] initial interpretations of § 1008 primarily did not take the form of formal regulations.[4] Rather, defendant initially interpreted § 1008 through a series of legal opinions issued by its Office of General Counsel (OGC). Defendant's contemporaneous interpretation of § 1008 permitted entities receiving Title X funds to provide neutral information to women regarding abortion in a counseling context, as long as the activity "did not have the immediate effect of promoting abortion or ... the principal purpose or effect of promoting abortion...." 53 Fed.Reg. 2923 (Feb. 2, 1988).

In January 1976, defendant issued Program Guidelines for Title X projects which, while not expressly incorporating the language of prior OGC legal opinions, stated that a Title X clinic should "... give pregnancy counseling [to patients], when appropriate, [and] make appropriate referrals for any needed services not furnished through the facility...." Bureau of Community Health Services (BCHS), HEW, Pub No. 76–16022, Program Guidelines for Project Grants For Family Planning Services under Section 1001, Public Health Service Act at 17 (1976), reprinted in Plaintiffs' Brief In Support Of Motion For A Preliminary Injunction, Appendix at A–41 (hereinafter "Plaintiffs' Brief").

In an April 1, 1978 OGC legal opinion, defendant reiterated its view that § 1008 "prohibits activities which promote or en-

courage the use of abortion as a method of family planning." OGC, HEW, Letter to Elsie Sullivan, Assistant for Information and Education, Office for Family Planning, BCHS at 2 (April 1, 1978), reprinted in Plaintiffs' Brief, Appendix at A–118. Defendant explicitly stated in this legal opinion that under its view of § 1008, "the provision of information concerning abortion services [and] mere referral of an individual to another provider of services for an abortion ... are not considered to be proscribed by § 1008." Id.

In 1981, defendant issued new Program Guidelines which explicitly adopted the OGC interpretation of § 1008, and stated inter alia:

> Pregnant women should be offered information and counseling regarding their pregnancies. Those requesting information on options for the management of an unintended pregnancy are to be given non-directive counseling on the following alternative courses of action, and referral upon request:
> —**Prenatal care and delivery**
> —**Infant care, foster care, or adoption**
> —**Pregnancy termination.**

BCHS, United States Department of Health and Human Services, Program Guidelines For Project Grants For Family Planning Services at 13 (1981) (emphasis in original), reprinted in Plaintiffs' Brief, Appendix at A–84, 98. At the time of their enactment, these Guidelines represented defendant's most formal and explicit statement of its view that § 1008 permits Title

---

**3.** At the time of these initial interpretations, defendant was known as Department of Health, Education, and Welfare (HEW). Allusions throughout this ruling to "defendant" refer to HEW or its successor, Department of Health and Human Services.

**4.** In 1971, defendant did promulgate formal regulations under Title X, however. 42 C.F.R. §§ 59.1–59.16 (1971), reprinted in 36 Fed.Reg. 18466–468 (Sept. 15, 1971). In particular, 42 C.F.R. § 59.5, originally entitled "Project requirements," provided in pertinent part:

> An approvable [project] application must contain ...
> (a) Assurances that ...
> (9) The project will not provide abortions as a method of family planning.

(d) Provision for medical services related to family planning including physician's consultation, examination, prescription, continuing supervision, laboratory examination, contraceptive supplies, and necessary referral to other medical facilities when medically indicated.

42 C.F.R. § 59.5 (1970).

> While these above-cited regulations alluded to consultation and referral, they did not explicitly address whether § 1008 permitted the dissemination of information to women about abortion in the counseling context. The Department of Health, Education, And Welfare did not explicitly address the issue of the scope of § 1008 until it issued legal opinions through its Office of the General Counsel (OGC).

X entities to offer neutral information to women about abortions, as well as referrals upon request to places which perform abortions. The 1981 Guidelines currently remain in effect, and will do so until superceded by the regulations at issue.

The above analysis demonstrates that from the time Congress enacted § 1008 in 1970, defendant consistently interpreted it to permit the neutral dissemination of information about abortion, and the referral upon request to entities which provide abortion. While defendant's interpretation of § 1008 primarily did not take the form of formal regulations and was not always stated using the same language, it is apparent to the Court that defendant until now always has interpreted § 1008 to permit Title X-funded clinics to counsel women about abortion in a non-directive fashion, and to make referrals upon request to abortion providers. The Court must accord "special deference" to this consistently held interpretation. *Associated Dry Goods*, 449 U.S. at 600 n. 17, 101 S.Ct. at 823 n. 17, citing *Trafficante v. Metropolitan Life Insurance Co.*, 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972).

The record is equally apparent that the regulations at issue represent an about-face in defendant's interpretation of § 1008.[5] For example, § 59.8 explicitly prohibits a Title X-funded clinic from pro-

viding any information to women about abortion, including abortion referrals, even though women may request such a referral. Section 59.8(a)(2) is directly contrary to the 1981 Program Guidelines because under it, a woman requesting information on options for management of an unintended pregnancy can no longer receive abortion counseling, but rather *must* be referred to a "list of available providers that promote the welfare of mother and unborn child." 53 Fed.Reg. 2945 (Feb. 8, 1988) (to be codified at 42 C.F.R. § 59.8(a)(2)). Defendant's departure from its contemporaneous and consistent interpretation of § 1008 is an important factor supporting the Court's conclusion that § 1008 does not authorize defendant to enact the regulations at issue.

A Court reviewing whether an agency has exceeded its statutory authority in promulgating regulations can look to subsequent legislation relating to the enabling statute and determine whether it sheds light on the purpose of the original enabling statute. *Consumer Product Safety Commission v. GTE Sylvania*, 447 U.S. 102, 118 n. 13, 100 S.Ct. 2051, 2061 n. 13, 64 L.Ed.2d 766 (1980), citing *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 380–81, 89 S.Ct. 1794, 1801–02, 23 L.Ed.2d 371 (1969).[6] Subsequent legislation bearing on

---

**5.** According to defendant, the regulations in question were enacted in large measure in response to audits of Title X programs performed by the General Accounting Office (GAO) and by the Inspector General of HHS. 53 Fed.Reg. 2923–24 (Feb. 2, 1988). It is true that in 1981, GAO and the Inspector General of HHS conducted separate audits of compliance by Title X agencies with § 1008. The GAO report, with which the Office of the Inspector agreed, "found no indications that any women were advised or encouraged to have abortions" by Title X clinics. Comptroller General, General Accounting Office, Restrictions On Abortion And Lobbying Activities In Family Planning Programs Need Clarification, at ii (1982) (hereinafter "GAO Report"); *reprinted in* Plaintiffs' Brief, Appendix at A–124, 127; *see also* Office of Inspector General, U.S. Department of Health and Human Services, Memorandum Regarding Review of PHS Title X Family Planning Grantees—Audit Control No. 12–33177 at 4 (Nov. 18, 1982), *reprinted in* Plaintiffs' Brief, Appendix at A–168. The GAO Report also found "variations in clinic practices" which it felt were "questionable in light of

HHS' interpretation of section 1008." GAO Report at ii. The Report recommended that the "Secretary establish clear operational guidance by incorporating into the Title X program regulations and guidelines HHS' position on the scope of the abortion restriction in section 1008." *Id.* at iv.

**6.** Defendant argues in its brief that "subsequent legislative history is decidedly unhelpful in ascertaining the intent of legislation adopted by a prior Congress." Defendant's Brief at 29, *citing Consumer Product Safety Commission v. GTE Sylvania*, 447 U.S. at 118 n. 13, 100 S.Ct. at 2061 n. 13. The Court agrees that *subsequent legislative history* is not very helpful in determining the intent of Congress when it enacted Title X in 1970. However, the Supreme Court in the above-cited case pointed out that "*subsequent legislation* declaring the intent of an earlier statute is entitled to great weight in statutory construction." *Id.* (emphasis added). It is true that no subsequent legislation interpreting Title X actually *declares* the intent of Congress when it enacted Title X. However, the subsequent

Title X after its enactment in 1970 provides helpful insight on Congressional intent and further support for the Court's conclusion that defendant exceeded its statutory authority in enacting the regulations at issue.

■ Congress has amended and/or reauthorized Title X six times since its passage in 1970. The policy of permitting Title X-funded entities to disseminate neutral information about abortion, including referrals to abortion providers upon request, has been in effect since virtually the inception of Title X. This means that Congress had at least six opportunities to change this policy but declined to do so. A purpose behind the reauthorization requirement contained in 42 U.S.C. § 300a(d) is to enable Congress to review the Title X program periodically and implement changes which it deems appropriate. Congressional refusal on repeated occasions to change its policy permitting the neutral dissemination of information about abortion represents a ratification of said policy. In fact, the Committee Reports which accompany the subsequent legislation bearing on Title X consistently reiterate that the program is functioning well and imply that the program should continue in its existing fashion. *See e.g.* Senate Comm. On Labor And Public Welfare, Special Health Revenue Sharing Act of 1975, S.Rep. No. 94–29, 94th Cong., 1st Sess. (1975), *reprinted in* 1975 U.S.Code Cong. & Admin.News 469, 515–20; *see also* Plaintiffs' Brief at 29 n. 32.

The circumstances surrounding the 1978 amendment of Title X shed particular light on the purpose of the original 1970 legislation. In 1978, the following amendment to Title X was introduced in the House of Representatives: "... No grant or contract authorized by this title may be made or entered into with an entity which directly or indirectly provides abortion, *abortion counseling,* or an *abortion referral services* (sic)." 124 Cong.Rec. 37045 (1978) (emphasis added). This proposed amendment would have reversed dramatically the pre-vailing interpretation of § 1008 by prohibiting Title X-funded clinics from disseminating any information about abortion to women, including referral information. However, Congress ultimately rejected this amendment by an almost 2–1 margin. *Id.* at 37048–49. Admittedly, there are some differences between the 1978 amendment and the current regulations at issue. However, these differences are not significant enough to minimize the importance of the Congressional defeat in 1978 of this amendment which, like the present regulations, would have prevented Title X-funded clinics from providing neutral information to women about abortion, including referrals upon request to abortion providers. Congress sent a clear signal in 1978 that § 1008 does not authorize regulations which prohibit the dissemination of full information to women entering Title X clinics, and the regulations at issue contravene this Congressional admonition.

■ Overall, then, upon reviewing the totality of the circumstances surrounding Congressional enactment of Title X in general and § 1008 in particular, the Court is convinced by a preponderance of the evidence that plaintiffs have a substantial likelihood of prevailing on the merits because defendant lacks the statutory authority to enact the regulations in question. The regulations mark a clear shift by defendant from prior, consistently held regulatory policy. In addition, they represent a social policy decision of important dimensions affecting a very divisive issue. Decisions of this magnitude, which involve a clear reversal of statutory interpretation and regulatory policy, should be made with clear statutory authority. Neither agencies nor the courts make the law. One of the Court's functions in this case is to review agency actions to ensure that they are authorized by statute. The regulations in question represent an impermissible instance of well-meaning but unelected public

legislation relating to Title X certainly bears on the earlier intent of Congress in 1970, and the Court can draw reasonable inferences about the earlier intent of Congress from this subsequent legislation. Thus, while the subsequent legisla-tion bearing on Title X is not entitled to "great weight" because it does not explicitly *declare* the intent of Congress in 1970, it certainly is entitled to some weight.

servants in the Executive branch amending legislation, or making the law, rather than simply filling in gaps left by Congress.

In reaching this ruling, the Court is mindful of the Supreme Court's statement in *Maher v. Roe*, 432 U.S. 464, 474, 97 S.Ct. 2376, 2382, 53 L.Ed.2d 484 (1977), that *Roe v. Wade* and its progeny do not prevent the Government from "mak[ing] a value judgment favoring childbirth over abortion, and [from] implement[ing] that judgment by the allocation of public funds." However, value judgments which amount to changes in a statute, which are what the new regulations represent, should be made by the elected, accountable Congress and not by the Executive branch.

Accordingly, in holding that defendant lacked statutory authority to enact the regulations at issue, the Court finds that plaintiffs have established a substantial likelihood of success on the merits, which is the first element of the *Lundgrin* test for issuance of a preliminary injunction. The Court need not reach the questions of whether the regulations are arbitrary and capricious or unconstitutional in resolving this first prong of the *Lundgrin* test.

*Irreparable Injury*

Sound principles of jurisprudence dictate that a court should not decide constitutional questions "unless such adjudication is unavoidable." *Harris v. McRae*, 448 U.S. 297, 307, 100 S.Ct. 2671, 2683, 65 L.Ed.2d 784, *reh'g denied*, 448 U.S. 917, 101 S.Ct. 39, 65 L.Ed.2d 1180 (1980), *quoting Spector Motor Service, Inc. v. McLaughlin*, 323 U.S. 101, 105, 65 S.Ct. 152, 154, 89 L.Ed. 101 (1944). In the case at bar, defendant has raised substantial questions regarding the nature and extent of the irreparable injury plaintiffs will incur from the implementation of the regulations at issue. As a result, the Court finds that resolution of plaintiffs' constitutional claims is unavoidable in order to resolve the irreparable injury issue.

■ It is well settled that the violation of constitutional rights, even for short periods, gives rise to irreparable injury. *See e.g. Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976); *New York Times Co. v. United States*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971). The regulations in question violate a woman's Fifth Amendment liberty interest in choosing whether to have an abortion, her First Amendment right to receive necessary medical information to enable her to vindicate her Fifth Amendment liberty interest, and a physician's First Amendment right to disseminate necessary medical information to patients. Consequently, the Court concludes that these constitutional violations result in irreparable injury which satisfies the second element of the *Lundgrin* test.

Regarding the Fifth Amendment issue, *Roe v. Wade* establishes that any state regulation which impinges upon a woman's fundamental right to have an abortion must be supported by a compelling state interest, or else it violates the Fourteenth Amendment. 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).[7] This Fifth Amendment liberty interest in having an abortion "... is broad enough to encompass a woman's decision whether or not to terminate her pregnancy." *City of Akron v. Akron Center For Reproductive Health*, 462 U.S. 416, 426, 103 S.Ct. 2481, 2490, 76 L.Ed.2d 687 (1983), *quoting Roe v. Wade*, 410 U.S. at 153, 93 S.Ct. at 727. It logically follows that defendant does not possess "unreviewable authority to decide what information a woman" receives in the context of deciding whether to have an abortion. *Thornburgh v. American College of Obstetricians & Gynecologists*, 476 U.S. 747, 761–62, 106 S.Ct. 2169, 2179, 90 L.Ed.2d 779, 794 (1986), *quoting Akron*, 462 U.S. at 443–44, 103 S.Ct. at 2499–500.

Subsequent Supreme Court decisions have set out the limits of state authority

---

**7.** Unlike *Roe* and its progeny, the present case involves a federal and not a state regulation affecting a woman's right to have an abortion. As a result, the present regulations implicate the Fifth Amendment but not the Fourteenth Amendment. However, the analysis remains the same regardless of whether the case involves the liberty interest embodied in the Fifth Amendment or the Fourteenth Amendment.

and established that *Roe* "protects the woman from unduly burdensome interference with her freedom to decide whether to terminate her pregnancy." *Harris v. McRae*, 448 U.S. at 314, 100 S.Ct. at 2686, *quoting Maher v. Roe*, 432 U.S. at 473–74, 97 S.Ct. at 2382. The regulations in question constitute an "unduly burdensome interference" with a woman's freedom to decide whether to terminate her pregnancy, and therefore violate the Fifth Amendment. They constitute such an interference because they impermissibly restrict the flow of information that a woman must have to make an informed decision whether to have an abortion.

In addition, the regulations intrude into the physician's crucial role in providing the woman with full information necessary to exercise fully her fundamental right to choose to have an abortion. For example, § 59.8 prohibits a practitioner in a Title X-funded clinic from discussing or even mentioning abortion to a woman, even in response to her inquiry, in virtually all circumstances. A woman seeking referral to a qualified abortion provider no longer can depend on the Title X clinic for this information. As a result, a woman no longer will possess full information necessary to vindicate her right to decide to terminate her pregnancy.

Under the regulations, practitioners counseling women on how to manage an unintended pregnancy will not be able to mention abortion, even if they consider such discussion medically necessary, except in rare circumstances. In fact, under the new definition of "family planning," it appears that a Title X clinic must cease virtually all communication with a woman once it determines she is pregnant. *See* 53 Fed. Reg. 2944–45 (Feb. 8, 1988) (to be codified at 42 C.F.R. §§ 59.2, 59.8 (including examples)). The only thing a Title X practitioner can do, or more precisely *must* do, is refer the pregnant woman to a censored list of providers that "promote the welfare of mother and unborn child." 42 C.F.R. § 59.8(a)(2). The bottom line is that a practitioner in a Title X-funded clinic is prevented from saying anything to a pregnant woman about abortion, even if she asks.

Thus, even if a woman arguably has the most urgent need for abortion counseling, the new regulations impose a virtual blanket prohibition upon a Title X practitioner's ability to provide such information.

The Supreme Court in *Roe v. Wade* and its progeny has stressed consistently the "central role of the physician" in enabling a woman to vindicate fully her Fifth Amendment right to decide to have an abortion. *Colautti v. Franklin*, 439 U.S. 379, 387, 99 S.Ct. 675, 681, 58 L.Ed.2d 596 (1979); *see also Doe v. Bolton*, 410 U.S. 179, 192, 93 S.Ct. 739, 747, 35 L.Ed.2d 201 (1973); *Thornburgh*, 476 U.S. at 761–62, 106 S.Ct. at 2179, 90 L.Ed.2d at 794; *Akron*, 462 U.S. at 444, 103 S.Ct. at 2500; *Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52, 66–67, 96 S.Ct. 2831, 2839–40, 49 L.Ed.2d 788 (1976). "Full vindication of a woman's fundamental right necessarily requires that her physician be given the room he needs to make his best medical judgment." *Akron*, 462 U.S. at 427, 103 S.Ct. at 2491, *quoting Doe v. Bolton*, 410 U.S. 179 at 192, 93 S.Ct. 739 at 747, 39 L.Ed.2d 201.

The regulations impermissibly interfere with the central role of the physician by limiting his discretion and thereby imposing upon him an "undesired and uncomfortable straitjacket" which is constitutionally intolerable. *Thornburgh*, 476 U.S. at 761–62, 106 S.Ct. at 2179, 90 L.Ed.2d at 794, *quoting Danforth*, 428 U.S. at 67, 96 S.Ct. at 2840 n. 8. The regulations prohibit a physician from providing women with neutral and often medically appropriate information about abortion, and also prohibit abortion referrals.

In addition, in some circumstances, such as a consultation with a pregnant woman, the regulations not only prohibit the physician from giving certain information, but actually require the physician to provide specific, censored information to her, even if the information does not comport with the physician's view of the best interests of his patient. *See* 42 C.F.R. § 59.8(a)(2). The Government's interest in regulating abortion "does not permit it to adopt regulations that depart from accepted medical

practice." *Akron*, 462 U.S. at 431, 103 S.Ct. at 2493. It appears to the Court that the regulations may force physicians in some circumstances to depart from accepted medical practice in the course of counseling women about family planning.[8] A woman cannot exercise fully her fundamental right to an abortion without benefit of the full breadth of her physician's knowledge and experience. The regulations improperly prevent a treating woman's physician from using his full complement of skills for his patient's benefit.

One way in which defendant attempts to distinguish many of the above-cited cases, such as *Roe, Danforth, Akron*, and *Thornburgh*, is by pointing out that, unlike the present regulations, these cases involved abortion provisions which contained criminal or quasi-criminal sanctions. However, these cases cannot be distinguished on this basis. For example, it is true that the abortion statutes at issue in *Thornburgh* and *Akron* contained criminal penalties, and also contained quasi-criminal sanctions against physicians. Certainly, the criminal and quasi-criminal nature of the sanctions were relevant to the Court's determination of unconstitutionality. However, in addition, the Supreme Court in both *Thornburgh* and *Akron* struck down the statutes on other "equally decisive" grounds. *Thornburgh*, 476 U.S. at 761–62, 106 S.Ct. at 2179, 90 L.Ed.2d at 794, *quoting Akron*, 462 U.S. at 445, 103 S.Ct. at 2500. The Court in both cases struck down the statutes because they intruded too far "upon the discretion of the pregnant woman's physician" and thereby prevented the woman from exercising her fundamental right to decide to have an abortion. *Id.*

Thus, the Supreme Court in *Thornburgh* and *Akron* was not simply concerned with the fact that the statutes in question contained criminal and quasi-criminal penalties. Rather, the Court expressed concern about statutes which impede the free flow of information between physician and patient. Simply stated, a statute or regulation does not have to contain a criminal or quasi-criminal penalty to constitute an "unduly burdensome interference" with a woman's freedom to decide to have an abortion. Defendant's attempt to distinguish these cases on this basis misses this point.

Defendant relies heavily upon *Maher v. Roe*, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977), and *Harris v. McRae*, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980), to support its contention that the regulations are constitutional. In *Maher*, the Supreme Court ruled that women are not entitled to Medicaid payments for abortions that are not medically necessary. In *Harris*, the Supreme Court upheld the constitutionality of the Hyde Amendment, Pub.L. 96–123, § 118, 93 Stat. 662, which severely limits the use of federal funds for the actual performance of abortions. Although the Court disagrees with plaintiffs' contention that the cases are inapposite, the cases are nonetheless distinguishable on several grounds.

First, both *Maher* and *Harris* involve government decisions not to pay for the *performance* of abortions. The regulations at issue do not relate to the performance of abortions, but rather impose restrictions on access to information which a woman needs to vindicate her fundamental right to decide to have an abortion. Restricting a woman's only means of access to vital information renders her right to decide whether to have an abortion largely illusory.

Second, unlike the present regulations, the statutes at issue in *Maher* and *Harris* did not intrude whatsoever upon the crucial role of the physician. As discussed earlier, the Supreme Court in *Roe* and its progeny has emphasized repeatedly the vital role of the physician in enabling a women to vindicate her fundamental right to decide to have an abortion. The statutes at issue in

---

**8.** Indeed, the fact that mainstream medical organizations, such as the American College of Obstetricians and Gynecologists, as well as the Dean of every school of public health in the United States have taken a public position opposing these regulations provides strong indication that the regulations in fact may force physicians to provide counseling in a manner which deviates from accepted medical practices.

*Maher* and *Harris* do not impose any restrictions upon the types of information that a physician may impart upon his patient and, as such, do not offend the consistent line of Supreme Court precedent respecting the physician's role. Conversely, the regulations in the case at bar involve censorship of what a physician can tell his patient, even if she asks. Moreover, the physician is required to make referrals from a censored referral list. The regulations undermine the physician's vital role and therefore are at odds with a clearly established line of precedent from *Roe v. Wade* onward.

Third, defendant cites *Maher* and *Harris* for the proposition that the Government can attach virtually any strings it wishes to funding that it gives out. To state it another way, since the Government in enacting the regulations is regulating only the behavior of entities and individuals using government funds, and is not regulating the behavior of private, non-federally funded entities or individuals, such action is permissible under *Maher* and *Harris*. Although the Government possesses greater latitude in directing use of its funds than it does in regulating private behavior, the assumption that private, non-indigent individuals are not affected is false. Given the structure of Title X programs, the regulations in question in fact will regulate private behavior, and improperly compromise the constitutional rights of non-indigent women.

In addition to serving indigent women, Title X also serves non-indigent women who pay a fee for these services. The proposed regulations apply to any woman who visits a Title X clinic. This means that paying patients will be subject to the same information limitations as indigent women, even though the Government is not paying for their visit to the clinic. In *Reproductive Health Services v. Webster*, 662 F.Supp. 407 (W.D.Mo.1987), a Court struck down a similar state provision affecting programs which, like Title X programs, served both indigent and non-indigent women. That Court recognized that the proposition in *Maher* and *Harris* that government can attach virtually any strings to

funds it gives out is less applicable in federally-funded programs which permit non-indigent individuals to participate. *Id.* at 427. In these circumstances, the non-indigent participants are not dependent on government money, so that the Government has less latitude in regulating their behavior.

Thus, it may be true from *Maher* and *Harris* that indigent people have less power to vindicate their constitutional rights to the extent that they must depend on federal financial support. However, non-indigent people do not depend on such support. Unlike the provisions in *Maher* and *Harris*, the present regulations violate the constitutional rights of non-indigent women seeking counseling from a Title X facility.

Finally, and most importantly, *Maher* and *Harris* are distinguishable because, unlike the present case, the provisions at issue did not implicate the First Amendment. Any government regulation which significantly impairs an individual's First Amendment rights must be supported by a compelling state interest. *Elrod v. Burns*, 427 U.S. 347, 362, 96 S.Ct. 2673, 2684, 49 L.Ed.2d 547 (1976). The regulations at issue violate a physician's First Amendment right to disseminate necessary medical information, as well as a woman's First Amendment right to receive necessary medical information to enable her to vindicate her Fifth Amendment right to choose whether to have an abortion. As such, the regulations in question violate First Amendment rights while the provisions at issue in *Maher* and *Harris* do not raise such problems.

The First Amendment "above all else ... means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Department v. Mosley*, 408 U.S. 92, 95, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972); *see also Consolidated Edison Co. of New York, Inc. v. Public Service Commission*, 447 U.S. 530, 536, 100 S.Ct. 2326, 2332, 65 L.Ed.2d 319 (1980). A reviewing court must strictly scrutinize government attempts to restrict expression in this manner. *Id.* Specifically, to withstand consti-

tutional muster under the First Amendment, the regulations must meet the following three pronged test: (1) the regulations must further a substantial governmental interest; (2) the governmental interest must be unrelated to the suppression of free speech; and (3) the incidental restrictions on First Amendment freedoms must be no more than necessary to further the governmental interest. *United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672, *reh'g denied,* 393 U.S. 900, 89 S.Ct. 63, 21 L.Ed.2d 188 (1968).

In the case at bar, the regulations represent content-based censorship which impermissibly impedes a physician's First Amendment freedom to disseminate relevant medical information to his patient. *See Planned Parenthood v. State of Arizona,* 789 F.2d 1348 (9th Cir.), *aff'd sub. nom., Babbitt v. Planned Parenthood of Central & Northern Arizona,* —— U.S. ——, 107 S.Ct. 391, 93 L.Ed.2d 346, *appeal dismissed, Planned Parenthood of Central & Northern Arizona v. Babbitt,* —— U.S. ——, 107 S.Ct. 391, 93 L.Ed.2d 346 (1986). Under the regulations, a physician discussing family planning matters with his patient is prohibited in virtually all instances from discussing abortion. The physician is not prohibited from discussing alternatives which promote the welfare of unborn children. In fact, when conferring with a pregnant woman, the physician is required under § 59.8(a)(2) to provide specific censored information calculated to promote the welfare of mother and unborn child. In this situation, the restrictions on free speech which the regulations impose are by no means "incidental," but rather are the principal means of achieving the goal of encouraging childbirth over abortion. This government-sponsored censorship of a physician's freedom to impart necessary medical information to his patient is impermissible under the First Amendment.

"Listeners" also have First Amendment rights to receive information. *Virginia Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 756–57, 96 S.Ct. 1817, 1822–23, 48 L.Ed.2d 346 (1975); *Kleindienst v. Mandel,* 408 U.S. 753, 762–63, 92 S.Ct. 2576, 2581–82, 33 L.Ed.2d 683 (1972); *Griswold v. Connecticut,* 381 U.S. 479, 482, 85 S.Ct. 1678, 1680, 14 L.Ed.2d 510 (1965). The First Amendment "prohibit[s] government from limiting the stock of information from which members of the public may draw." *First National Bank of Boston v. Bellotti,* 435 U.S. 765, 783, 98 S.Ct. 1407, 1419, 55 L.Ed.2d 707, *reh'g denied,* 438 U.S. 907, 98 S.Ct. 3126, 57 L.Ed.2d 1150 (1978). In particular, women have a First Amendment right to receive information about abortion. *Bigelow v. Virginia,* 421 U.S. 809, 821–22, 95 S.Ct. 2222, 2232–33, 44 L.Ed.2d 600 (1975); *Planned Parenthood v. Fitzpatrick,* 401 F.Supp. 554, 577–78 (E.D.Pa.1975) (three-judge court), *aff'd sub. nom., Franklin v. Fitzpatrick,* 428 U.S. 901, 96 S.Ct. 3202, 49 L.Ed.2d 1205 (1976).

The regulations at issue impermissibly impede a woman's right of access to information about abortion. For example, if a woman at a Title X clinic asks her physician for information about abortion, the physician in most circumstances cannot tell the woman anything other than that the clinic does not believe in abortion and therefore does not talk about it. Indeed, the regulations appear to prohibit the practitioner in a Title X facility from referring the patient to a non-Title X facility which provides mere abortion counseling, because such a referral may "increase the availability or accessibility of abortion for family planning purposes." 42 C.F.R. § 59.10(a). In other words, the regulations effectively prevent many women from obtaining any information about abortion, and therefore violate a woman's First Amendment right to receive information about abortion.

It is one thing for the Government to implement a policy against abortion by refusing to fund abortions. Such action is permissible under both *Maher* and *Harris.* However, the Government in enacting the present regulations is restricting what people hear or read about abortion. This they may not do. *Bigelow v. Virginia,* 421 U.S. 809, 827–28, 95 S.Ct. 2222, 2235–36, 44 L.Ed.2d 600 (1975). The regulations accord preferential treatment to speech favoring childbirth, and this is impermissible under

the First Amendment. As such, the regulations do not survive strict scrutiny under the First Amendment.[9]

In delaying the effective date of these regulations, the Court again is very aware that the Government is "not foreclosed from asserting an interest in whether pregnancies end in abortion or childbirth." *Akron*, 462 U.S. at 444 n. 33, 103 S.Ct. at 2500 n. 33. The Government certainly may implement a value judgment favoring childbirth over abortion through the use of federal funds. *Maher*, 432 U.S. at 474, 97 S.Ct. at 2382. However, the Government does not possess unbridled power to do so. The regulations at issue simply go too far, impeding a woman's constitutional right of access to information, and constituting an "unduly burdensome interference" with her fundamental right to decide to have an abortion. The regulations also violate a physician's First Amendment right to disseminate necessary medical information to his patients. Since the constitutional violations are present, plaintiffs have established irreparable injury, thereby satisfying the second element of the *Lundgrin* test.

### Balance of Hardship

To satisfy the third element of the *Lundgrin* test, plaintiffs must show that their threatened injury outweighs any whatever damage the proposed injunction may cause defendant. The Court has discussed thoroughly the irreparable injuries that plaintiffs will suffer as a result of defendant's violation of the First and Fifth Amendments. The implementation of the regulations will have serious adverse consequences for women, indigent and non-indigent, who use Title X facilities. They will also adversely affect the practitioners at these facilities who will be prevented from providing full information to clients. The only injury which defendant will suffer

from the Court's issuance of a preliminary injunction is that the effective date of the regulations will be delayed. Accordingly, the Court finds that the threatened injury to plaintiffs outweighs the damage that delaying the onset date of the regulations will cause defendant, so that plaintiffs have satisfied the third element of the *Lundgrin* test.

### Harm to the Public Interest

The final prong of the *Lundgrin* test requires plaintiffs to demonstrate that the preliminary injunction, if issued, would not be adverse to the public interest. Regulations which violate constitutional rights of individuals are harmful to the public interest, and injunctions which delay the implementation of said regulations promote the public interest by preserving adherence to the letter and spirit of the Constitution. In the present case, delaying the enforcement of unconstitutional regulations is not adverse to the public interest, but rather promotes the public interest.

### Conclusion

For the reasons stated above, the Court finds that plaintiffs have satisfied the four requirements set out in *Lundgrin v. Claytor* for the issuance of a preliminary injunction. Accordingly, it is

ORDERED that plaintiffs' Motion For Preliminary Injunction is granted. It is

FURTHER ORDERED that the Court incorporates by reference the Preliminary Injunction order which the parties jointly submitted to the Court on February 23, 1988. It is

FURTHER ORDERED that this written Order Granting Plaintiffs' Motion For Preliminary Injunction supercedes the oral bench ruling issued on February 15, 1988. It is

---

**9.** There are certain provisions in the regulations which appear more acceptable than others. For example, § 59.10(a)(1) is a limitation on lobbying by Title X entities which appears acceptable in light of Supreme Court case law. *See Regan v. Taxation With Representation*, 461 U.S. 540, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983). However, § 59.10(a) is a blanket prohibition on activities Title X entities may pursue which raises serious constitutional problems. It is inappro-

priate for the Court to assume the role of the legislature or administrative agency and selectively choose which provisions of the regulations shall remain in light of this ruling. Consequently, the Court prefers to invalidate the regulations in their entirety and remand the case to defendant so that defendant, rather than the Court, can perform the task of drafting regulations which withstand constitutional scrutiny.

FURTHER ORDERED that the Court reserves ruling on defendant's Motion To Dismiss Or, In the Alternative, For Summary Judgment.