**COMMONWEALTH OF MASSACHUSETTS, et al., Plaintiffs,**

v.

**Otis R. BOWEN, Secretary, Health and Human Services, Defendant.**

**Civ. A. No. 88–0253–S.**

United States District Court, D. Massachusetts.

March 3, 1988.

---

Paul Glickman, Jamin B. Raskin, Asst. Attys. Gen., Boston, Mass., James L. Feldesman, Susan D. Lauscher, Klores, Feldesman & Tucker, Washington, D.C., for plaintiffs.

Robert J. Cynkar, Thomas Millet, Deputy Asst. Attys. Gen., Dept. of Justice, Washington, D.C., for defendant.

## MEMORANDUM AND ORDER FOR FINAL DECREE

SKINNER, District Judge.

Plaintiffs in this action seek to enjoin the application and enforcement of regulations promulgated by the defendant purporting to carry out the purposes of Section 1008 of Title X of the Public Health Services Act. 42 U.S.C. § 300a–6 (1982). The defendant moved to consolidate the hearing on plaintiffs' motion for a preliminary injunction with the hearing on the merits pursuant to Fed.R.Civ.P. 65(a)(2). At oral argument I denied the motion on the representation of the plaintiffs that there were unresolved questions of fact raised by their several affidavits. Upon examination of these affidavits, however, I conclude that the issues of fact they raise relate to predicted adverse consequences of the regulations, such as their potential for conflict with the medical ethics of some physicians, and to the likelihood of immediate irreparable harm. Plaintiffs argue that Congress could not have intended the predicted consequences and that the regulations therefore violate congressional intent. If unintended consequences were enough to invalidate government action, I doubt that much would survive. Such policy considerations are in any case for Congress, not the courts. Furthermore, immediate irreparable injury is not an issue unless preliminary relief is to be granted. Since the control-

ling legal issues have been fully briefed and argued, there is no reason to delay a final decision. My order denying the motion to consolidate is VACATED and the motion to consolidate is ALLOWED. A final decree will issue.

## A. The Controversy

On February 2, 1988, the Department of Health and Human Services ("HHS") amended the regulations governing the use of federal funds for family planning services. Its purported goal was to assure compliance with section 1008 of Title X:

None of the funds appropriated under this subchapter shall be used in programs where abortion is a method of family planning.

42 U.S.C. § 300a–6 (1982). Historically, this section had been interpreted by HHS (and the Department of Health, Education and Welfare, its predecessor) to prohibit the use of federal funds in the provision of abortions, or in any activity that had the immediate effect of "promoting or encouraging" abortion. The new regulations, which are scheduled to go into effect in two parts, on March 3 and April 4, 1988, significantly expand the scope of prohibited activity.

The new regulations define family planning to exclude all pregnancy care (including obstetric and prenatal care). They provide that a project may not receive federal funds unless it assures compliance with the following rules:

(1) A project may not provide counseling concerning the use of abortion as a method of family planning or provide referral for abortion as a method of family planning. 42 C.F.R. § 59.8(a)(1) (1988).

(2) Once a client is diagnosed as pregnant, she must be provided with a list of providers that promote the welfare of the mother and unborn child.[1] She must also be provided with information to protect the health of the mother and unborn child until

---

1. At oral argument plaintiffs' counsel pointed out that this language excludes providers that offer abortion counseling or services. Defend- ant did not contest this interpretation, and I will accept it as conceded.

the referral appointment is kept. 42 C.F.R. § 59.8(a)(2) (1988).

(3) A project may not use prenatal, social service or emergency medical or other referrals as an indirect means of encouraging or promoting abortion as a method of family planning. 42 C.F.R. § 59.8(a)(3) (1988).

(4) The provision of contraceptive information may not include counseling with respect to abortion as a method of family planning, although it may include information which is medically necessary to assess the risks and benefits of different methods of contraception. 42 C.F.R. § 59.8(a)(4) (1988).

(5) A project may not use Title X funds to promote or advocate abortion as a method of family planning. 42 C.F.R. § 59.10(a) (1988). Prohibited activities include:

a. Lobbying for legislation to increase the availability of abortion as a method of family planning;

b. Providing speakers to promote the use of abortion as a method of family planning;

c. Paying dues to any group that as a significant part of its activities advocates abortion as a method of family planning;

d. Using legal action to make abortion more readily available as a method of family planning;

e. Developing or disseminating any information which advocates abortion as a method of family planning.

(6) A Title X project must be organized so that it is physically and financially separate from all prohibited activities. The Secretary of HHS will determine whether such objective integrity and independence exist based on an individual review of a number of factors and circumstances. 42 C.F.R. § 59.9 (1988).

The regulations also define "Title X project funds," for the first time, to include "all funds allocated to the Title X program, including, but not limited to grant funds, grant-related income or matching funds." 42 C.F.R. § 59.2 (1988). A Title X project has always been required to supplement its federal grant with 10% matching funds. In practice most Title X agencies also charge

fees for services to those clients who have the ability to pay, in general generating another 10% of their budget. Therefore, when the regulations limit the use of "Title X project funds," they in fact significantly restrict a project's use of both federal, and non-federal, money.

Plaintiffs allege that the new regulations conflict with Title X and violate the First and Fifth Amendments of the United States Constitution. The only existing precedent consists of an as yet unpublished opinion of Judge Zita Weinshienk on a motion for preliminary injunction in *Planned Parenthood Federation of America, et al. v. Bowen,* 680 F.Supp. 1465 (D.Colo.1988). Judge Weinshienk has ruled that the regulations violate the intent of Congress and the constitutional rights of the plaintiffs and has entered a preliminary injunction prohibiting the defendant from enforcing the new regulations or conditioning Title X grants upon compliance with them.

### B. Conflict with the Statute

#### 1. *General Considerations*

The defendant has broad authority to promulgate regulations under Title X. 42 U.S.C. § 300a–4(a) (1982). The regulations must be consistent with and must further the purposes of the statute. The particular section of the statute involved in this case is ambiguous. It is not clear whether the prohibition in section 1008 of the use of appropriated funds "in programs where abortion is a method of family planning" is limited to programs which offer or promote abortions, as plaintiffs say, or whether it provides "a wall of separation" between Title X programs and all abortion related activity, as the defendant says. "[T]he question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 21 L.Ed.2d 694 (1984).

In pursuit of their favored constructions of the statute, the parties have tried to run to ground that hardy chimera, congression-

al intent. In my view, congressional intent must be considered with respect to specific issues raised by the new regulations.

### a. Counseling and Referral
### 42 C.F.R. §§ 59.8(a)

In support of their respective positions about the validity of the counseling and referral restrictions, the parties cite various pronouncements by individual members of Congress. Plaintiffs cite a 1988 committee report accompanying a Continuing Resolution which encouraged continuation of the prior regulations without change. A group of senators and congressmen filed an *amici* brief which indicates their own support and refers to the support of many other congressmen for the regulations as promulgated. These expressions of various individuals are of little assistance in evaluating the intent of Congress as a collective body. *Consumer Products Safety Commission v. G.T.E. Sylvania*, 447 U.S. 102, 118, 100 S.Ct. 2051, 2061, 64 L.Ed.2d 766 (1980); *Chrysler Corporation v. Brown*, 441 U.S. 281, 311, 99 S.Ct. 1705, 1722, 60 L.Ed.2d 208 (1979). Rep. Dingall's statement in 116 Cong.Rec. 37,375 (1970) is countered by his subsequent letter to the defendant dated October 14, 1987.

Plaintiffs rely on congressional acquiescence to prior longstanding administrative interpretation of the statute by the defendant and his predecessors. In a series of memoranda and opinions from 1970 to the promulgation of these regulations, the Department of Health and Human Services (and the Department of Health, Education and Welfare) consistently interpreted the statute to forbid Title X recipients from conducting activities which had the direct effect of promoting or encouraging abortion, but to allow the clinics to furnish information concerning abortion services. In 1981, departmental guidelines were issued which mandated non-directive counseling on options for pregnant women, including abortion, when a client requested information. Referral for the purpose of abortion was permitted. Memorandum from Joel N. Mangel, Office of General Counsel, HEW, to Louis M. Hellman, Deputy Assistant Secretary for Population Affairs (April 20, 1971); Memorandum of Carol C. Conrad, Office of General Counsel, HEW, to Elsie Sullivan, Office for Family Planning (April 11, 1978); Bureau of Community Health Services, Department of Health and Human Services, Program Guidelines for Project Grants for Family Planning Services (1981).

There is no doubt that Congress was aware of this administrative history and yet resisted attempts to change the statute. If the validity of the departmental interpretation from 1970 to the present were in question, this history would be compelling. *Lorillard v. Pons*, 434 U.S. 575, 580, 98 S.Ct. 866, 869–70, 55 L.Ed.2d 40 (1978); *United States v. Correll*, 389 U.S. 299, 305–06, 88 S.Ct. 445, 448–49, 19 L.Ed.2d 537 (1968). The new regulations represent an abrupt reversal of existing policy which is not positively mandated by section 1008. The plaintiffs argue that since Congress acquiesced in the former policy, the proposed regulations violate Congress' intent and must be struck down. Judge Weinshienk takes essentially the same view. This assumes that Congress operates on a binary system like a computer; i.e., that it has only two choices. Congress gave to the defendant very broad authority to promulgate regulations, and it is an equally valid supposition in my opinion that Congress would tolerate a wide range of administrative policies. *Helvering v. Reynolds*, 313 U.S. 428, 432, 61 S.Ct. 971, 973–74, 85 L.Ed. 1438 (1941); *McCoy v. United States*, 802 F.2d 762, 766 (4th Cir.1986).

■ While a good case can be made for the plaintiff's proposition that these regulations violate congressional intent, the question is not sufficiently free of doubt in my mind to justify judicial intervention. Accordingly, no injunction will issue to the cited sections of the regulations on the ground of contravention of the intent of the statute, apart from constitutional considerations to be discussed *infra.*

■ There is a related doctrine, however, that when an agency decides to change the course of longstanding administrative interpretation, it must justify its action to a

greater degree than when it first promulgates regulations:

> A "settled course of behavior embodies that agency's informed judgment that, by pursuing that course, it will carry out the policies committed to it by Congress. There is, then, at least a presumption that those policies will be carried out best if the settled rule is adhered to." *Atchison, T. & S.F.R. Co. v. Wichita Bd. of Trade*, 412 U.S. 800, 807–808 [93 S.Ct. 2367, 2375, 37 L.Ed.2d 350] (1973). Accordingly, an agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance.

*Motor Vehicle Manufacturers Association v. State Farm Mutual*, 463 U.S. 29, 41–42, 103 S.Ct. 2856, 2865–66, 77 L.Ed.2d 443 (1983).

■ The defendant puts forth two reasons for the changes in his agency's policy. First, he argues that the new interpretation is mandated by the statute. This clearly is not the case. Second, the defendant argues that the regulations are needed to assure compliance with the mandate of section 1008 that the provision of abortion services be kept separate from Title X funds. The defendant must show that this explanation is supported by the evidence before the agency. *Motor Vehicle Manufacturers Association v. State Farm Mutual*, 463 U.S. at 43, 103 S.Ct. at 2866–67.

All the evidence before the defendant indicated that Title X clinics were substantially complying with program requirements. *Family Planning Act Reauthorization, 1985: Hearings before the Subcomm. on Health and the Environment of the House Comm. on Energy and Commerce*, 99th Cong., 1st Sess. 189 (1985) (statement of Dr. James O. Mason, Acting Assistant Secretary for Health, HHS) ("the prohibition against abortion was well-known at the level of the family planning clinics, and it was being honored"); *Family Planning Act Reauthorization, 1985: Hearings Before the Subcomm. on Health and the Environment of the House Comm. on Energy and Commerce*, 98th

Cong., 2d Sess. 472 (1984) (statement of Margaret M. Heckler, Secretary, HHS) (same); Comp.Gen.Rep. No. GAO/HRD–82–106 (1982) ("GAO found no evidence that title X funds had been used for abortions or to advise clients to have abortions"); Memorandum from Richard P. Kusserow, Inspector General, to Edward N. Brandt, Jr., Assistant Secretary for Health (November 18, 1982) ("Grantees were generally aware of the legal prohibitions against using Title X grant funds for lobbying, contributions to third parties, and/or abortion related activities").

The agency can only point to the General Accounting Office's suggestion in its 1982 report that HHS issue regulations to clarify the standards under section 1008. Comp.Gen.Rep. No. GAO/HRD–82–106 at iv. This can best be interpreted, however, as a suggestion that HHS codify its longstanding policy into regulations, so as to reduce any confusion about program requirements. There was no suggestion that significantly more stringent regulations need be issued in order to assure compliance.

The agency also refers, in its commentary to the new regulations, to a number of letters received by the agency from individual clients of Title X clinics who claimed that they were pressured into undergoing abortions which they did not want, and subsequently came to regret. 53 Fed.Reg. 2924–25 (February 2, 1988). In light of the anecdotal nature of these letters, and their inconsistency with the GAO report and Secretary Heckler's testimony, they are not reliable evidence upon which to base such a significant policy reversal.

In *Motor Vehicle Manufacturers Association, supra*, the Court refused to enforce regulations which reversed prior administrative policy and remanded the matter to the agency to amend the regulations to conform to the record. I suppose an option in this case would be to stay the effective date of the HHS regulations to give the executive branch an opportunity to amplify the record justifying its policy change. In view of the constitutional considerations

discussed *infra*, however, such a procedure would be pointless.

### b. Lobbying and Advocacy

### 42 C.F.R. § 59.10(a)

█ The restrictions on lobbying and advocacy are for the most part a codification of prior administrative interpretation. A 1978 memorandum from the HEW Office of Legal Counsel indicated that Title X funds could not be used for advocacy activity designed to promote abortion as a method of family planning. Memorandum from Carol C. Conrad to Elsie Sullivan (April 11, 1978). Congressional acquiescence in these restrictions, despite repeated opportunity to amend the statute, can fairly be construed as an indication that the restrictions are consistent with congressional intent. *Lorillard v. Pons*, 434 U.S. at 580, 98 S.Ct. at 869–70; *United States v. Correll*, 389 U.S. at 305–06, 88 S.Ct. at 448–49.

The new regulations, of course, have a wider impact because of the new (and unwarranted) definition of "Title X Project Funds." The new regulations prohibit the use of non-federal funds for lobbying as well as federal funds, and also prohibit membership in or support of any organization which engages in lobbying. While this extension is not so radical a change as to warrant a conclusion that the new regulations violate the intent of Congress, the constitutional implications are serious, as discussed *infra*.

### c. Physical and Financial Separation

### 42 C.F.R. § 59.9

█ The program integrity regulations promulgated by HHS require that a Title X grantee be physically separated from any program that performs activities prohibited under the statute. 42 C.F.R. § 59.9 (1988). There is no indication in section 1008 that Congress intended to restrict the types of projects with which a Title X recipient could associate, or to place limitations on

the physical proximity or the sharing of personnel between Title X projects and unrelated programs which may provide abortion services. The statute merely restricts some uses of appropriated funds.

The legislative history of Title X offers persuasive evidence that the program integrity regulations run contrary to congressional intent underlying section 1008. The original Conference Report on Title X stated that the abortion prohibition was "not intended to interfere with or limit programs" supported with other than Title X funds. H.R.Conf.Rep. No. 1667, 91st Cong., 2d Sess. (1970), *reprinted in* 1970 U.S.Code Cong. & Admin.News 5068, 5082. Furthermore, the Report of the Senate Labor and Public Welfare Committee for the 1975 reauthorization of Title X provided:

> The Committee encourages the use of funds otherwise authorized by this bill for the provision of family planning services, not only in specialty clinics, but, where such facilities do not exist or are impractical, in entities devoted to comprehensive health care for low-income families.... [I]t is essential that there be close coordination and, whenever possible, integration of family planning services into all general health care programs.

S.Rep. No. 63, 94th Cong., 1st Sess. 65–66 (1975), *reprinted in* 1975 U.S.Code Cong. & Admin.News 469, 528.

The contemporaneous and continuous agency interpretation was consistent with this view.[2] Indeed, the statute itself mandates a state plan for a *"coordinated and comprehensive* program of family planning services" as a prerequisite to any Title X grant. 42 U.S.C. § 300a(a) (1982) (emphasis added). The requirement of physical separation runs contrary to this congressional emphasis on coordinated and integrated health care services.

---

**2.** The agency position, until these regulations were promulgated, was that as long as funds were kept separate, physical separation was unnecessary. In 1971, the Office of General Counsel of the Department of Health, Education and Welfare indicated in an opinion letter that under most circumstances, a hospital providing abortions for family planning purposes would be qualified to receive Title X funds for the operation of a separate family planning clinic, as long as funds were kept separate. Memorandum from Joel M. Mangel to Louis M. Hellman at 3 (April 20, 1971).

Defendant argues that the validity of the program integrity regulations is not presently ripe for review. The regulations require that the Secretary make an individual determination of program integrity for each grant recipient. They require physical and financial separation, and articulate a number of factors upon which the Secretary may rely in making his decision. Defendant argues that until the regulations are construed and applied, the question of their validity should not be decided.

The Supreme Court has articulated a ripeness test that directs courts to evaluate two criteria: "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). The appropriateness of an issue for judicial review depends upon a number of factors, including whether the agency action is final, whether the issue presented requires additional factual development, and whether further administrative action is needed to clarify the agency's position. *Action Alliance of Senior Citizens v. Heckler*, 789 F.2d 931, 940 (D.C.Cir. 1986).

Defendant argues that this part of the regulations will be applied on a case-by-case basis, and, therefore, that it is premature to adjudicate its validity. I see no need to litigate each instance separately. These are the defendant's regulations and it is reasonable to assume that he will do what he says he will do, which is to require physical separation. This clearly runs counter to congressional policy favoring coordination and integration of health care programs. It will be enjoined.

d. Definition of "Title X Project Funds" 42 C.F.R. § 59.2

■ The proposed regulations define "Title X project funds" to include "all funds allocated to the Title X program, including, but not limited to grant funds, grant-related income or matching funds." The effect is to put the use of matching funds and the income from fee paying clients under the same restrictions as funds appropriated by Congress. There is no ba-

sis for this definition in the statute and no legislative or administrative history to support it. I assume that this beginning exercise in political redefinition ("think-speak" in Orwellian terms) was designed to preempt the constitutional argument to be discussed hereinafter. In my opinion, it is unwarranted. The legislative concern was with the use of *public* money.

### C. Constitutional Considerations

Plaintiffs challenge the new regulations on First and Fifth Amendment grounds. Because the limitations on counseling and referral and the limitations on lobbying and advocacy require different constitutional analyses, I will address each separately.

#### 1. *Counseling and Referral*

Under the new regulations, a Title X project may not provide abortion counseling or referral. 42 C.F.R. § 59.8(a)(1)–(3) (1988). It may not counsel with respect to abortion as a method of family planning when it provides contraceptive information. 42 C.F.R. § 59.8(a)(4) (1988). Any project which conducts any of these activities is ineligible for a Title X grant. 42 C.F.R. § 59.7 (1988). If an organization conducts these activities in a separate program, the Title X project must be physically and financially separate from the prohibited activities. 42 C.F.R. § 59.9 (1988).

The restriction on abortion counseling and referral extends to an entire Title X "project," and to all Title X "project funds," as redefined by the regulations. As a result, even a project which uses non-federal funds, either matching funds or private funds, to provide abortion counseling or referral, is made ineligible to receive a Title X grant.

■ Plaintiffs argue that these restrictions violate the First Amendment to the United States Constitution. Abortion referral and abortion counseling are constitutionally protected speech under the First Amendment. *Bigelow v. Virginia*, 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975). Denying an otherwise eligible organization a grant because it provides abortion counseling or referral, even with

non-federal funds, constitutes an impermissible penalty for the exercise of a constitutionally protected right. The government may not penalize an individual for exercising his or her First Amendment rights, even if the penalty is the denial of a government benefit:

> [E]ven though a person has no "right" to a valuable governmental benefit and even though the government may deny him the benefit for a number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech.

*Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972).

The government argues that it may constitutionally choose not to subsidize certain activities. In *Maher v. Roe,* 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977), and in *Harris v. McRae,* 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980), the Supreme Court was presented with challenges to Medicaid systems that did not subsidize abortion. The Court held that the state may make a value judgment favoring childbirth over abortion, and may implement that value judgment by the allocation of public funds. In essence, the Court said the government had no obligation to subsidize abortion, or to subsidize abortion and childbirth equally. In both cases, however, the Court acknowledged the difference between a refusal to subsidize and a penalty. The Court noted that refusing all Medicaid benefits to a woman because she had an abortion, although the practice might "promote childbirth," would be an impermissible penalty for the exercise of a constitutionally protected right. *Harris v. McRae,* 448 U.S. at 317, n. 19, 100 S.Ct. at 2688 n. 19; *Maher v. Roe,* 432 U.S. at 474–475, n. 8, 97 S.Ct. at 2383 n. 8.

The defendant argues that the HHS regulations are permissible under *Maher* and *Harris* because they merely reflect the government's legitimate decision not to subsidize certain activities. The defendant ignores, however, the crucial difference between a failure to subsidize and a penalty for the exercise of constitutional rights. The HHS regulations go beyond a mere refusal to subsidize. Under the new regulations, a Title X project could be denied a grant for which it would otherwise be eligible, solely because its non-federally funded activities include abortion referral and counseling. As a result, the regulations constitute an unconstitutional penalty for the exercise of First Amendment rights. *See Reproductive Health Services v. Webster,* 662 F.Supp. 407, 427–28 (W.D.Mo. 1987) (invalidating as unconstitutional provisions which prohibit the expenditure of public funds, actions of public employees, or use of public facilities, for the purpose of, *inter alia,* counseling a woman to have an abortion); *Planned Parenthood v. State of Arizona,* 537 F.Supp. 90 (D.Ariz. 1982) (invalidating as unconstitutional a bill which prohibited state money from being given to agencies which offer abortion counseling or referral), *rev'd and remanded,* 718 F.2d 938 (9th Cir.1983), *aff'd after remand,* 789 F.2d 1348 (9th Cir.1986), *aff'd sub nom. Babbitt v. Planned Parenthood,* — U.S. ——, 107 S.Ct. 391, 93 L.Ed.2d 346 (1986).

■ Furthermore, the restriction on speech imposed by the defendant's regulations is content-based. These regulations, individually and as a whole, have the purpose and effect of severely limiting speech by Title X recipients on one topic: abortion as a method of family planning. Such a content-based distinction violates the First Amendment: "[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Department of Chicago v. Mosley,* 408 U.S. 92, 95, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972).

The new regulations cannot withstand the "critical scrutiny" demanded by accepted First Amendment and equal protection principles. *First National Bank of Boston v. Bellotti,* 435 U.S. 765, 786–87, 98 S.Ct. 1407, 1421–22, 55 L.Ed.2d 707 (1978). The government has not suggested a compelling governmental interest that would

justify the content-based distinction. If a regulation is narrowly tailored to achieve a compelling governmental interest, incidental restrictions on speech will on occasion be tolerated. *United States v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968). In this case, however, the regulations are specifically designed to suppress speech, and particularly directed at the suppression of one viewpoint. As a result, they run directly contrary to the dictates of the First Amendment.

In its attempt to implement a health care policy which promotes childbirth, the defendant has devised a system which rests in large part on keeping Title X clients in ignorance. The First Amendment embodies a different philosophy:

> There is, of course, an alternative to this highly paternalistic approach. That alternative is to assume that this information is not in itself harmful, that people will perceive their own best interests if only they are well enough informed, and that the best means to that end is to open the channels of communication rather than to close them.

*Virginia Pharmacy Board v. Virginia Consumer Council*, 425 U.S. 748, 770, 96 S.Ct. 1817, 1829–30, 48 L.Ed.2d 346 (1976).

### 2. *Lobbying and Advocacy*

The prohibitions in 42 C.F.R. § 59.10 on activities that encourage, promote, or advocate abortion clearly implicate the First Amendment. Even the Secretary concedes, in his brief on this motion, that lobbying and other advocacy activities are at the "core" of the First Amendment. While the constitutional underpinning for the right to *have* an abortion is relatively abstruse, see *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and remains the subject of learned discourse, the right to *talk* about abortion is firmly and expressly guaranteed. Prior to *Roe v. Wade*, some states permitted abortions and some did not. The discussions that led to these legislative policies were clearly protected by the First Amendment, and such discussions remain so today.

The new regulations reflect more than a mere refusal to subsidize protected First Amendment activity. The regulations refuse funding to any organization that engages in abortion-related advocacy, even if non-federal funds, such as matching grants or private funds, are used. In addition, an organization that supports lobbying or other advocacy activity with funds wholly separate from its Title X grants must physically separate this activity from its Title X project.

The government argues that the regulations are constitutional under the holding of the Supreme Court in *Regan v. Taxation with Representation*, 461 U.S. 540, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983). In that case, the Court upheld a statute which denied the right to obtain tax deductible contributions to organizations that engage in substantial lobbying. The Court held that Congress has a right to refuse to pay for lobbying out of public money. It pointed out that an organization which engaged in lobbying was not penalized, because it could locate all of its non-lobbying activity in a separate corporate structure. The separate, non-lobbying corporation could then receive tax deductible contributions. The Court also held that the lobbying restriction did not violate the equal protection component of the Fifth Amendment, even though veterans' associations were allowed by statute to engage in substantial lobbying activity while receiving tax deductible contributions.

Applying the same reasoning to this case, the government says that it may constitutionally choose not to subsidize lobbying. It argues that because family planning projects can place their lobbying activities in a separate organizational structure, the regulations restricting lobbying are constitutional. This argument is unpersuasive for two reasons. First, the regulations impose an additional requirement of physical separation which, however it would ultimately be implemented by the Secretary, is unduly burdensome and not narrowly tailored to meet the government's goal of not subsidizing advocacy activity. *See Regan v. Taxation with Representation*, 461 U.S. at 554, 103 S.Ct. at 2005

(Blackmun, J., concurring) (emphasizing that the I.R.S. required only separate incorporation and separate record-keeping, and questioning whether more burdensome requirements would be constitutional).

More importantly, this case is distinguishable because the lobbying restriction in the HHS regulations is content-based. The Supreme Court in *Taxation with Representation* specifically said: "The case would be different if Congress were to discriminate invidiously in its subsidies in such a way as to 'aim at the suppression of dangerous ideas.'" *Regan v. Taxation with Representation*, 461 U.S. at 548, 103 S.Ct. at 2002. It upheld the classification only because it found "no indication that the statute was intended to suppress any ideas or any demonstration that it has had that effect." *Id.*

The advocacy restrictions in the HHS regulations are clearly designed to suppress a certain idea: they restrict only advocacy that promotes abortion as a method of family planning. As discussed previously, such a content-based distinction violates the First Amendment. Because the restrictions are not narrowly tailored to serve any legitimate governmental interest, they violate both the First Amendment and the equal protection component of the Fifth Amendment to the United States Constitution.

### 3. *Impact on the Right of Privacy*

■ While the relationship of these regulations to the liberty interest protected by the Fifth and Ninth Amendments is more attenuated than to the First Amendment, it is still significant. The right to elect an abortion in the first trimester is constitutionally protected from unduly burdensome governmental interference. *Roe v. Wade*, 410 U.S. at 163, 93 S.Ct. at 731–32; *Maher v. Roe*, 432 U.S. at 473–74, 97 S.Ct. at 2382–83 (1977). In my opinion, a governmentally imposed block on the flow of neutral information bearing on abortion is an impermissible burden on the presently recognized rights of a pregnant client of a Title X clinic. An example of such an improper burden is the prohibition against non-directive referrals to health providers who offer abortion counseling or services.

### D. Conclusion

If these regulations were to be considered solely on the basis of congruence with legislative intent, or solely on the basis of constitutional violation, some attempt at severance might be in order. As the foregoing discussion establishes, however, there is very little in these regulations which does not offend one standard or the other. Severance would save practically nothing. The attempt would be inappropriate. *See Thornburgh v. American College of Obstetricians & Gynecologists*, 476 U.S. 747, 764, 106 S.Ct. 2169, 2181, 90 L.Ed.2d 779 (1986) ("The radical dissection necessary for this would leave little resemblance to that intended ..."). The regulations promulgated on February 2, 1988 by the Department of Health and Human Services pursuant to Title X of the Public Health Service Act as a whole violate both congressional intent and rights protected by the Constitution. A final decree shall enter enjoining their enforcement.

I have the authority to enjoin the defendant from implementing the regulations against any of the plaintiffs in this action. *See Califano v. Yamasaki*, 442 U.S. 682, 702, 99 S.Ct. 2545, 2558, 61 L.Ed.2d 176 (1978) (Scope of injunctive relief includes that which is necessary to afford relief to all complaining parties). This court has national jurisdiction in federal question cases. *Omni Capital International v. Rudolph Wolff & Co., Ltd.*, — U.S. —, 108 S.Ct. 404, 98 L.Ed.2d 415 (1987). Two plaintiffs in this action, the National Family Planning and Reproductive Health Association ("NFPRHA") and the American Public Health Association ("APHA"), are national organizations suing in their representative capacities. NFPRH represents nearly 75% of Title X recipients and 285 subgrantees across the country. The Massachusetts Attorney General appears for all Title X recipients in Massachusetts. Because the standing of these plaintiffs to sue in their representative capacity has not been challenged, they may properly assert

the rights of their constituents. *See Hunt v. Washington Apple Advertising Commission,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977) (setting forth standards for determining an association's standing to sue in its representative capacity); *Planned Parenthood Federation v. Schweiker,* 559 F.Supp. 658, 664 (D.D.C.) (concluding NFPRHA has standing to sue as a representative of a class of member affiliate family planning clinics), *aff'd,* 712 F.2d 650 (D.C.Cir.1983).

The Secretary is therefore enjoined from implementing the regulations promulgated on February 2, 1988 pursuant to Title X of the Public Health Service Act, as against any of the plaintiffs in this action or any of the entities they represent, wherever situated.[3]   I assume that the Secretary, as a responsible public official, will apply this judicial determination evenhandedly to all similarly situated entities in the United States. *See Feld v. Berger,* 424 F.Supp. 1356, 1363 (S.D.N.Y.1976). *Accord Vulcan Society of the New York City Fire Department, Inc. v. Civil Service Commission,* 490 F.2d 387, 399 (2d Cir.1973); *Stanton v. Board of Education,* 581 F.Supp. 190, 195 (N.D.N.Y.1984).

A final decree shall issue forthwith.

### FINAL DECREE

This cause came on to be heard on the plaintiffs' motion for a preliminary injunction, and a motion for consolidation of said hearing with the hearing on the merits under Fed.R.Civ.P. 65(a)(2) having been allowed, and after consideration of the briefs and arguments of the parties, intervenor and *amici,* in accordance with the Memorandum and Order filed herewith, it is ORDERED, ADJUDGED AND DECREED that:

1.  The defendant in his capacity as Secretary of the Department of Health and Human Services and all officers, agents, employees and attorneys of said Department are enjoined from enforcing or applying the regulations published at 52 Fed.Reg. 2944–2946 (February 2, 1988),

including without limitation those regulations appearing at 42 C.F.R. §§ 59.7, 59.-8, 59.9 and 59.10, and the related definitions appearing at § 59.2, against these plaintiffs and the entities they represent, in any manner either directly or indirectly, anywhere within the United States.

2.  The defendant shall forthwith notify all affected officers, agents, servants, employees and attorneys of the Department of Health and Human Services of the substance of this decree.

**3.**  If the plaintiffs wish to amplify this order by submitting a list of the agencies they represent, I will amend the final decree by appending that list.