**PLANNED PARENTHOOD OF KANSAS, INC., and Sharilyn Young, Plaintiffs,**

**v.**

**CITY OF WICHITA; Bob Knight, Greg Ferris, Frank Ojile, Estella Martinez, Willis Wall, U.L. "Rip" Gooch, Sheldon Kamen, in Their Capacity as Mayor and Members of the Wichita City Council, Governing Body of the City of Wichita, a City of the First Class; the Board of County Commissioners of the County of Sedgwick; Bernard A. Hentzen, Mark Schroeder, Dave Bayouth, Billy G. McCray, Bill Hancock, as Members of the Board of County Commissioners of the County of Sedgwick, Governing Body of Sedgwick County; and Hal D. Schwartz, Woodi Wooding, Ralph Hight, Richard D. Ewy, Frances Jackson, Donna Rae Malone, Owen Maddox, M.D., William C. Skaer,**

**D.V.M., Wesley H. Sowers, Sidney Sproul, Elsie E. Steelberg, M.D., in Their Capacity as Members of the Wichita–Sedgwick County Board of Health, Defendants.**

**No. 89–1655–K.**

United States District Court, D. Kansas.

Jan. 3, 1990.

William P. Tretbar, Fleeson, Gooing, Coulson & Kitch, Wichita, Kan., Beth Otten, Roger Evans, Planned Parenthood Federation of America, Inc., New York City, for plaintiffs.

Alan L. Rupe, Grace & Rupe, Thomas R. Powell, City Atty., Joe Allen Lang, Douglas J. Moshier, Wichita, Kan., for defendants.

## MEMORANDUM AND ORDER

PATRICK F. KELLY, District Judge.

Planned Parenthood of Kansas, Inc., and its Executive Director, Sharilyn Young, have brought the present action seeking

declaratory and injunctive relief against the defendants, the City of Wichita, Kansas, and the Board of County Commissioners of Sedgwick County, Kansas. Also named as defendants are the individual members of the Wichita City Council and individual County Commissioners, as well as individual members of the Wichita–Sedgwick County Board of Health.

The matter is currently before the court on the plaintiffs' motion for a preliminary injunction. The plaintiffs seek an injunction prohibiting the defendants from terminating the contract between the parties for family planning services. A hearing on the plaintiffs' motion was held on January 3, 1990, at the conclusion of which the court announced its decision. Consistent with the statements of the court at that time, and for the reasons discussed herein, the plaintiffs' motion is granted.

*Findings of Fact*

Planned Parenthood is a private, non-profit Kansas corporation. Planned Parenthood provides family planning and education, including counseling on all pregnancy options, including abortion referrals. It engages in advocacy activities to promote access to reproductive health care, including the right to safe and legal abortion. It does not, however, provide abortions.

Since 1977, Planned Parenthood has operated its family planning clinic with the support of funds from the United States Department of Health and Human Services (HHS) pursuant to Title X of the Public Health Service Act, 42 U.S.C. § 300 *et seq.* HHS issues grants to the Kansas Department of Health and Environment, which then subgrants the funds to the Wichita–Sedgwick County Board of Health. The Board of Health then contracts with Planned Parenthood for family planning services to minor females. The Board of Health is governed jointly by the Wichita City Commission and the Sedgwick County Board of County Commissioners.

The present contract between Planned Parenthood and the Board of Health was executed on June 23, 1989. Under the contract, Planned Parenthood is to provide "[c]omprehensive family planning services to at least three hundred (300) teenage persons requesting such services." The contract, effective July 1, 1989, has a stated termination date of June 30, 1990. Paragraph 7(D) of the contract provides in part that:

1. Neither [Planned Parenthood] or its contractors provide abortion as a method of family planning, and

2. Neither [Planned Parenthood] nor its contractors is involved in abortion related activities as defined by a memorandum of the Office of General Counsel dated April 14, 1978 (Subject: Section 1008 P.H.S. Act–Permissible Activities by Grantees).[1]

The present contract is the twelfth consecutive agreement for the provision of family planning services between Planned Parenthood and the Board of Health.

Meeting *en banc* on July 25, 1989, the City Commission and the Board of County Commissioners adopted a resolution barring the Board of Health from contracting with Planned Parenthood for the provision of family planning services. On that date, the Commission and Board took up the issue of the proposed 1990 budget for the Board of Health. When the matter was opened for public comment, several members of the public expressed concern over the issue of abortion.

One speaker stated that the contract with Planned Parenthood was "in some ways a smoke screen for abortion counseling." Another stated that Planned Parenthood "is not an organization that should be receiving tax dollars, frankly, of any kind." A third citizen expressed his objection "to my tax dollars being used for an organization that many of us find morally repugnant." In all, some seven citizens expressed opposition to the Department of

---

**1.** In an Office of General Counsel (OGC) opinion issued April 1, 1978, quoted in *PPFA v. Bowen,* 680 F.Supp. 1465, 1470 (D.Colo.1988), OGC stated that "the provision of information concerning abortion services [and] mere referral of an individual to another provider of services for an abortion" do not violate the requirements of Section 1008 of Title X.

Health's Contract with Planned Parenthood.

Members of the Council and Board expressed agreement. Commissioner Bernard Hentzen announced that

you know and I know that Planned Parenthood has earned the reputation for providing abortions and the counseling of abortions in this country. I want to assure you and the other members of the Council that I will not vote for the Health Department Budget as long as that's in there.

Council Member U.L. "Rip" Gooch expressed the limited intent of the resolution, stating that the Board of Health was not restricted from pursuing other means to provide family planning services, and that the resolution "just eliminated the one particular organization."

The motion taken up at the meeting states the Director of the Board of Health would be instructed "not to contract with Planned Parenthood for family planning services and to look elsewhere for that service." The motion was approved by a 3–2 vote of the Board of Commissioners, and a 4–3 vote of the City Council. The meeting subsequently approved an amendment which instructed the Board of Health to identify and recommend a substitute entity to provide family planning services.

There was no testimony or evidence introduced at the July 25 meeting indicating that Planned Parenthood had failed to comply with the terms of its contract, or that it was in any way in violation of HHS standards in the use of its Title X funds. The Board of Health believed the decision to terminate incorrect. On October 12, 1989, the Board approved a motion, stating

1) the Planned Parenthood organization has been abiding fully with the agreement, dated July 1, 1989, between that organization and the Board of Health, and in complete compliance with the Title X family planning guidelines, and 2) that no good or just cause has been shown to cause termination of that agreement, when, in fact, the quality of their medical services is beyond reproach....

The Board also voted to inform the City Council and the Board of County Commissioners that, after "an extensive search," it had found "no other organization able, or willing, to provide acceptable services" in substitution for those currently provided by Planned Parenthood.

On October 23, 1989, the Wichita City Attorney and the Sedgwick County Counselor wrote to the Director of the Board of Health, Dr. Fred Tosh. They stated that under the resolution adopted on July 25, the Board was required to issue a notice of termination of the contract to Planned Parenthood as soon as possible.

Hal Schwarz, Chairperson of the Board of Health wrote to Plaintiff Young on November 9, 1989. Schwarz stated that despite the Board's effort in October to obtain a reconsideration of the resolution, "[t]here has been no indication that City Council members or County Commissioners wish to change their stand." Accordingly, Schwarz wrote, the Board had voted to notify Young that the contract would terminate at the close of business on January 8, 1990. Schwarz concluded the letter stating that the Board of Health

wishes to express its appreciation for the high quality services Planned Parenthood has provided over the years and wants you to know this notice of cancellation is being given as ordered by the governing bodies and in no way reflects dissatisfaction with the services you have provided under our agreement.

### Findings of Law

The plaintiffs seek a preliminary injunction barring termination of their contract with the Board of Health. To obtain an injunction, a movant must demonstrate that (1) the movant possesses a substantial likelihood of success on the merits; (2) irreparable injury will result if the injunction is not granted; (3) the threatened injury to the movant outweighs any damage the injunction would cause the opposing party; and (4) the injunction would not be adverse to the public interest. *Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir.1980). If the movant successfully demonstrates

the last three conditions, it need only establish a fair ground for litigation. *Seneca–Cayuga Tribe v. State ex rel. Thompson*, 874 F.2d 709, 716 (10th Cir.1989). The decision to grant a preliminary injunction lies within the sound discretion of the district court. *Oil, Chemical & Atomic Workers Int'l Union v. Amoco Oil Co.*, 885 F.2d 697, 703 (10th Cir.1989).

In support of their motion, the plaintiffs advance three arguments. First, they contend that the July 25 resolution violates their rights, and their clients' rights, under the First and Fourteenth Amendments. Second, they contend that the resolution was unconstitutional as an illegal bill of attainder. Finally, they contend the resolution deprived them of equal protection of the laws.

### 1. Likelihood of Success on the Merits

#### A. First and Fourteenth Amendment Claims

No evidence was introduced at the July 25 meeting, in which the Board of Health's governing bodies voted to terminate funding to Planned Parenthood, that Planned Parenthood was in violation of its contract with the Board of Health, or that it was in violation of federal guidelines relating to Title X grants.

The plaintiffs provide nondirective, neutral information about the options, including abortion, available to pregnant women. Upon request, Planned Parenthood will make abortion referrals. Under federal guidelines controlling the use of Title X funds, the plaintiffs are both permitted and required to offer these services.

■ Title X of the Public Health Service Act, 42 U.S.C. §§ 300–300a–6, was enacted in 1970. It authorizes the Secretary of HHS to make grants to family planning services projects, and provides for grants for the training of personnel for family planning projects. Section 1008 of Title X, 42 U.S.C. § 300a–6, provides: "None of the funds appropriated under this subchapter shall be used in programs where abortion is a method of family planning." The Act therefore prohibits the use of Title X funds

for direct advocacy of abortion. It does not bar the neutral dissemination of information relating to abortion, including referrals upon request to abortion providers. *Planned Parenthood Federation of America v. Bowen*, 680 F.Supp. 1465 (D.Colo. 1988).

HHS has adopted numerous guidelines regulating the use of Title X funds. Guidelines adopted by HHS in 1981 provide that:

> Pregnant women should be offered information and counseling regarding their pregnancies. Those requesting information on options for the management of an unintended pregnancy are to be given non-directive counseling on the following alternative courses of action, and referral upon request:
> —Prenatal care and delivery
> —Infant care, foster care, or adoption
> —Pregnancy termination.

HHS, Program Guidelines For Project Grants For Family Planning Services, at 13 (1981) (emphasis in original). In addition, Title X regulations have always required abortion referrals when a woman's life is endangered. *See* 42 C.F.R. § 59.5(b)(1) (1988).

In 1985, in extending funding for Title X, the House of Representatives approved the following guidelines:

> No agency shall be considered to be in violation of the language regarding Title X of the Public Health Service Act if a pregnant woman is offered information and counseling regarding her pregnancy; those requesting information on options for the management of an unintended pregnancy are to be given non-directive counseling on the following alternative courses of action, and referral upon request:
> a. prenatal care and delivery;
> b. infant care, foster care or adoption;
> c. pregnancy termination.

H.R.Rep. No. 403, 99th Cong., 1st Sess. 6 (1985). In 1978, the House had rejected a proposed amendment to Title X which would have denied grants to entities "which directly or indirectly provides abortion, abortion counseling, or an abortion

referral services [sic]." 124 Cong.Rec. 37045–46 (1978). Since that time, Congress has consistently acquiesced in the policy of allowing Title X entities to disseminate neutral information on abortion and, upon request, provide referrals to abortion providers. *See PPFA v. Bowen*, 680 F.Supp. at 1472 ("Congressional refusal on repeated occasions to change its policy permitting the neutral dissemination of information about abortion represents a ratification of said policy.").

In 1987, HHS proposed regulations reinterpreting Title X grant requirements. Under the new regulations significant limitations were placed on the ability of Title X grant recipients to provide nondirective, neutral abortion information. *See* 53 Fed. Reg. 2922–46 (Feb. 2, 1988) (to be codified at 42 C.F.R. § 59.2 *et seq.* (1988)). Enforcement of the proposed regulations, however, has been enjoined as inconsistent with the legislative intent underlying Title X. *See PPFA v. Bowen*, 687 F.Supp. 540 (D.Colo. 1988); *Massachusetts v. Bowen*, 679 F.Supp. 137 (D.Mass.1988), *aff'd sub nom. Massachusetts v. Secretary of HHS*, 873 F.2d 1528 (1st Cir.1989), *opinion withdrawn and en banc reh'g granted*, (order of Aug. 9, 1989). *But see New York v. Bowen*, 690 F.Supp. 1261 (S.D.N.Y.1988), *aff'd without opinion*, 863 F.2d 46 (2d Cir.1988), *cert. denied*, — U.S. —, 109 S.Ct. 3255, 106 L.Ed.2d 601 (1989), *opinion issued sub nom. New York v. Sullivan*, 889 F.2d 401 (2d Cir.1989).

In striking down the proposed regulations, the District Court of Colorado found in *PPFA v. Bowen*, 680 F.Supp. at 1468, that found Congress had not authorized HHS "to enact regulations which restrict a woman's access to information about abortion." The proposed regulations were inconsistent with the original Congressional intent behind Title X, legislative action subsequent to the passage of the Act, and prior administrative interpretations. 680 F.Supp. at 1468–72. In addition, the regulations were found unconstitutional as a violation of the First and Fifth Amendments in both *PPFA v. Bowen*, 680 F.Supp. at 1474–1478, and *Massachusetts v. Bowen*, 679 F.Supp. at 144–147.

Subsequently, HHS has issued modified proposed regulations for Title X grants. 53 Fed.Reg. 13325, 13328 (April 22, 1988). These also, however, have been struck down as inconsistent with the Congressional intent behind Title X, and as unconstitutional under the First Amendment. *PPFA v. Sullivan*, No. 88–5565 (E.D.Pa. Dec. 8, 1989) (1989 WL 149755).

■ In the present case, there is no identifiable rationale for the decision to terminate funding to Planned Parenthood of Kansas other than the perception that the organization, in the words of one speaker, was "a smoke screen for abortion counseling." Or, as one county commissioner put it, because nationwide Planned Parenthood "has earned the reputation" for providing or counseling abortions.

Three speakers at the July 25 meeting stressed that federal guidelines for Title X funds required the provision of nondirective information on abortion. Dr. Tosh, the Director of the Board of Health, told the City Council and Board of Commissioners that "[a]ccording to the guidelines that we have, you do need to mention that [abortion]'s an option." Plaintiff Young, Executive Director of Planned Parenthood of Kansas, also remarked that "the law requires that you mention all the choices." Finally, Council Member Estella Martinez expressed concern that the resolution would force the Board of Health to find a substitute entity that would perform "exactly the same thing that Planned Parenthood does [since] you have to go by these guidelines."

This, however, did not alter the visceral dislike of the Planned Parenthood expressed at the meeting. The only response recorded in the minutes is the statement by Commissioner Hentzen:

Yes, and the guidelines are changed . . . kind of with the weather you know; if they're wrong, they need to be changed.

The only explanation for the action taken at the July 25 meeting is its status as viewpoint-based discrimination against the plaintiffs. The resolution singles out Planned Parenthood on the basis of its

advocacy of certain unpopular ideals. As such, the resolution represents content-based censorship which impermissibly impedes Planned Parenthood's "First Amendment freedom to disseminate relevant medical information." *PPFA v. Bowen*, 680 F.Supp. at 1477.

At the hearing on the plaintiffs' motion, counsel for the defendants advanced an alternative explanation for the termination of the Planned Parenthood contract. According to the argument now advanced by the defendants, the contract with Planned Parenthood was terminated because the Board of Health, having received a reinterpretation from its legal counsel of its potential liability for providing counseling to minors without parental consent, has now undertaken to supply those services previously supplied by Planned Parenthood. Thus, the defendants argue, there simply was no further need for the Planned Parenthood contract.

A review of the record quickly reveals that the defendants' argument is simply an attempt, after the fact, to manufacture a justification for the July 25 resolution which does not implicate the plaintiffs' constitutional rights. In the minutes of the July 25 meeting, there is no mention of requiring the Board of Health to serve as a substitute for Planned Parenthood. Rather, as noted above, the singular and express rationale for the termination of the contract was the disapproval of the "reputation" of Planned Parenthood.

Indeed, immediately after approving the resolution terminating the contract with Planned Parenthood, the defendants approved an amendment instructing the Board of Health to identify entities (other than Planned Parenthood) who could supply the required services. Over two months later, the Board was still unable to do so. On October 12, 1989, the Board approved a resolution directing its Chairperson to write the defendants that the Board's "extensive search has shown no other organization able, or willing, to provide acceptable services." Clearly, the present argument now advanced by the defendants was not the true motivation for

the defendants' action on July 25, 1989. It is instead an attempt to offer a sham rationale for an action which was motivated in fact by public disapproval of the plaintiffs' reputation.

The defendants also stress that the Board of Health's contract with Planned Parenthood contains a provision for termination by either party upon 60 days notice. Paragraph 2 of the agreement provides in part that the agreement "may be terminated by either party giving at least sixty (60) days written notice." But while this provision gives the defendants the contractual authority to terminate the agreement, it does not and cannot permit them to do so for purposes offensive to the Constitution.

■ Pregnant women have a strong interest in securing accurate, objective, and unbiased information about the choices available to them. *See Thornburgh v. American College of Obstetricians and Gynecologists*, 476 U.S. 747, 760–64, 106 S.Ct. 2169, 2178–81, 90 L.Ed.2d 779 (1986); *Akron v. Akron Ctr. for Reproductive Health, Inc.*, 462 U.S. 416, 443–48, 103 S.Ct. 2481, 2499–502, 76 L.Ed.2d 687 (1983). Among these choices, women have a First Amendment right to receive information about abortion. *Bigelow v. Virginia*, 421 U.S. 809, 822, 95 S.Ct. 2222, 2232, 44 L.Ed.2d 600 (1975); *PPFA v. Bowen*, 680 F.Supp. at 1477; *Planned Parenthood Ass'n v. Fitzpatrick*, 401 F.Supp. 554, 577–78 (E.D.Pa.1978), *aff'd sub nom. Franklin v. Fitzpatrick*, 428 U.S. 901, 96 S.Ct. 3202, 49 L.Ed.2d 1205 (1976). The physician counseling a pregnant woman enjoys a constitutional right to dispense medical information on the basis of her individual circumstances, without the burden of an "undesired and uncomfortable straitjacket" imposed by the state. *Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52, 67, 96 S.Ct. 2831, 2840, 49 L.Ed.2d 788 (1976).

■ The resolution here at issue intrudes upon the basic privacy right of women to make an informed decision regarding a pregnancy. "Restricting a woman's only means of access to vital [medical] information renders her right to decide whether to

have an abortion largely illusory." *PPFA v. Bowen,* 680 F.Supp. at 1475. In addition, the resolution represents an impermissible limitation upon the free speech rights of the plaintiffs. *See Boos v. Barry,* 485 U.S. 312, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988).

■ It is correct that the government has no positive obligation to fund or subsidize certain activities, including abortion. *Webster v. Reproductive Health Services,* —— U.S. ——, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989); *Harris v. McRae,* 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980); *Maher v. Roe,* 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977). However, while the government need not subsidize a woman's right to abortion, it may not create "a penalty for the exercise of constitutional rights." *Massachusetts v. Bowen,* 679 F.Supp. at 145. The state may adopt a policy favoring childbirth over abortion, and may refuse to subsidize abortions. But the state may not impose barriers upon a woman's access to information, nor create penalties for persons supplying such information. *See PPFA v. Sullivan,* No. 88–5565, Slip op. at 18–19 (E.D.Pa. Dec. 8, 1989) (1989 WL 149755); *PPFA v. Bowen,* 680 F.Supp. at 1475–76; *Massachusetts v. Bowen,* 679 F.Supp. at 145; *Reproductive Health Services v. Webster,* 662 F.Supp. 407, 427–28 (W.D.Mo.1987), *aff'd,* 851 F.2d 1071 (8th Cir.1988), *rev'd on other grounds,* —— U.S. ——, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989).

For at least a quarter-century, this Court has made clear that even though a person has no "right" to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized

and inhibited. This would allow the government to "produce a result which [it] could not command directly." *Speiser v. Randall,* 357 U.S. 513, 526 [78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460 (1958) ][.] Such interference with constitutional rights is impermissible.

*Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972).

The July 25 resolution is unconstitutional as a violation of the First Amendment freedoms of Planned Parenthood and its clients. In supplying neutral, nondirective information about abortion, the plaintiffs were engaging in an activity protected by the First Amendment and required by federal law. Because the defendants' action represents such a naked attempt to discriminate against the plaintiffs on the basis of constitutionally-protected speech, the plaintiffs have demonstrated a likelihood of success on the merits. The resolution is invalid and enforcement of the resolution is enjoined.

### B. Bill of Attainder

The plaintiffs also argue that the July 25 resolution is unconstitutional as a bill of attainder. Bills of attainder are prohibited under Art. 1, Sec. 9, cl. 3 of the Constitution. The states are prohibited from passing such legislation by Art. 1, Sec. 10, cl. 1. A bill of attainder exists where an individual has been singled out for "legislatively prescribed punishment ... whether the individual is called by name or described in terms of conduct which, because it is past conduct, operates only as a designation of particular persons." *Communist Party v. Subversive Activities Control Bd.,* 367 U.S. 1, 86, 81 S.Ct. 1357, 1405, 6 L.Ed.2d 625 (1961); *Cummings v. Missouri,* 4 Wall. 277, 71 U.S. 277, 18 L.Ed. 356 (1867). The Supreme Court has identified three elements to be used in determining whether a statute serves as an unconstitutional attainder through the infliction of legislative punishment:

(1) whether the challenged statute falls within the historical meaning of legislative punishment; (2) whether the statute, "viewed in terms of the type and severity

of burdens imposed, reasonably can be said to further nonpunitive legislative purposes"; and (3) whether the legislative record "evinces a congressional intent to punish."

*Selective Service System v. Minnesota Pub. Interest Research Group,* 468 U.S. 841, 852, 104 S.Ct. 3348, 3355, 82 L.Ed.2d 632 (1984) (quoting *Nixon v. Administrator of General Services,* 433 U.S. 425, 473, 475–476, 478, 97 S.Ct. 2777, 2805, 2806–2807, 2808, 53 L.Ed.2d 867 (1977)).

■ Persons challenging a statute, alleging that it is unconstitutional as a bill of attainder or *ex post facto,* face a heavy standard of proof.

[O]nly the clearest proof could suffice to establish the unconstitutionality of a statute on such a ground. Judicial inquiries into Congressional motives are at best a hazardous matter, and when that inquiry seeks to go behind objective manifestations it becomes a dubious affair indeed.

*Flemming v. Nestor,* 363 U.S. 603, 617, 80 S.Ct. 1367, 1376, 4 L.Ed.2d 1435 (1960). While the general nature of bills of attainder may be easily summarized, in practice, "each case has turned on its own highly particularized context." *Flemming,* 363 U.S. at 616, 80 S.Ct. at 1375.

As stated at the hearing of the present matter, the court will reserve judgment on the plaintiffs' bill of attainder argument. Challenges to legislation as unconstitutional attainders are closely tied to the individual circumstances present in each case. Because of the close proximity of the date for the proposed termination of the Planned Parenthood contract, the court will withhold a decision on the matter. The injunction will issue based upon the plaintiffs' First Amendment and equal protection claims.

### C. Equal Protection

■ Issuance of a preliminary injunction is warranted in the present case by the third argument advanced by the plaintiffs. The plaintiffs argue that the July 25 resolution is unconstitutional as a violation of equal protection.

From the minutes of the July 25 meeting, it is clear that the resolution adopted by the Wichita City Council and the Sedgwick County Board of Commissioners was intended to create a distinction between Planned Parenthood and other family planning organizations. Immediately after approving the resolution terminating the contract with Planned Parenthood, the council and board approved an amendment authorizing the Board of Health to determine which organizations, if any, could provide substitute family planning services. As council member U.L. "Rip" Gooch stated, under the resolution the Board of Health was not prohibited from attempting to provide family planning services, "it just eliminated the one particular organization."

At a minimum, the distinction in the July 25 resolution between Planned Parenthood and all other family planning organizations must be rationally related to a legitimate governmental purpose. *See United States Dept. of Agriculture v. Moreno,* 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973). Here, however, there is no legitimate governmental purpose. The resolution was adopted in retaliation for the plaintiffs' pursuit of constitutionally-protected activities, and the record is devoid of a legitimate rationale which would justify the distinction between Planned Parenthood and other family planning organizations. If equal protection of the laws has any meaning, "it must at the very least mean that a bare congressional desire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest." *Moreno,* 413 U.S. at 534, 93 S.Ct. at 2825 (emphasis in original).

Thus, in *Planned Parenthood of Minnesota v. Minnesota,* 612 F.2d 359 (8th Cir.), *aff'd,* 448 U.S. 901, 100 S.Ct. 3039, 65 L.Ed.2d 1131 (1980), the Eighth Circuit struck down as unconstitutional a state statute providing funds for pre-pregnancy family planning to hospitals and health maintenance organizations, but not to other nonprofit organizations, such as Planned Parenthood. The court found that the distinction contained in the statute did not further a legitimate governmental purpose,

and therefore violated equal protection of the laws. The true purpose underlying the statute was invalid:

> The record demonstrates that Planned Parenthood of Minnesota in its abortion stance has made itself unpopular among some segments of the population. The legislative history of [the statute] indicates that Planned Parenthood's unpopularity played a large role in its passage. Planned Parenthood's unpopularity in and of itself and without reference to some independent considerations in the public interest cannot justify [the exclusion of funding].

612 F.2d at 361.

■ Citing *Benson v. De Soto*, 212 Kan. 415, 510 P.2d 1281 (1973), the city argues that the motion adopted at the July 25 meeting was a resolution rather than an ordinance, and hence that its action did not rise to the level of legislation. The distinction drawn by the defendant is artificial and frivolous. 42 U.S.C. § 1983 provides protection for persons deprived of constitutional rights through state action. The Equal Protection Clause applies to "the exercise of state power however manifested, whether exercised directly or through subdivisions of the State." *Avery v. Midland County*, 390 U.S. 474, 480, 88 S.Ct. 1114, 1118, 20 L.Ed.2d 45 (1968).

Here the defendants, through the use of the statutory authority granted them by K.S.A. 65–205, acted to deprive the plaintiffs of the equal protection of the laws. Certainly counsel for the city and county, in their letter to the Board of Health on October 23, 1989, did not believe that the action taken on July 25 was simply advisory or an expression of intent. Rather, they instructed the Board that the termination of the contract with Planned Parenthood was mandatory under state law:

> Once direction is given by the City Council and County Commission sitting in an en banc meeting, the Board of Health must comply with such directions in order to be in compliance with K.S.A. 65–205.

Having acted under color of state law, the defendants may not cloak their actions now under the semantic distinction currently advanced.

Here, the plaintiffs were deprived of the benefit of continued access to Title X funding simply because of the reputation and unpopularity of Planned Parenthood. The record fails to reveal that at the time of the resolution the defendants even made the pretense of attempting finding a rational distinction between Planned Parenthood and other family planning organizations. Because the resolution violates the equal protection of the laws guaranteed by the constitution, its enforcement may be enjoined.

### 2. Irreparable Injury

■ In discussing the likelihood of the plaintiffs' success on the merits, it can also be seen that the present matter involves a threat to important constitutional rights of the plaintiffs and their clients. The effect of the resolution of July 25 is to impede the free flow of neutral, objective medical information to the women, whether indigent or nonindigent, who utilize the services provided by Planned Parenthood with the assistance of Title X funds.

Moreover, the resolution also restricts the constitutional freedom of the plaintiffs to provide that information to their clients. Because the present case involves potential injuries of such gravity and magnitude to the plaintiffs and their clients, the case is an appropriate one for injunctive relief.

### 3. Corresponding Injury to the Nonmovant

In order to secure a preliminary injunction, the movants must demonstrate that their threatened injury outweighs any damage the injunction may cause to other parties to the litigation. As discussed above, the July 25 resolution poses a serious threat to the constitutional freedoms of the plaintiffs. Moreover, it also creates a dangerous limitation on the amount and quality of health care information available to the plaintiffs' clients. The defendants, however, do not face any serious damage from the proposed injunction, which would simply require that the defendants adhere

to their contract with Planned Parenthood until a full trial of the present matter. Accordingly, this element of the test for injunctive relief is satisfied.

### 4. Public Interest

An award of injunctive relief in the present matter would not be adverse to the public interest. Rather, a preliminary injunction would serve to further the public interest by guaranteeing the plaintiffs' constitutional freedom to provide medical advice to their clients, and by ensuring that their clients possess the necessary information to fully vindicate their constitutional right to privacy. *See PPFA v. Bowen,* 687 F.Supp. at 544.

IT IS ACCORDINGLY ORDERED this 3rd day of January, 1990, that the plaintiffs' motion for a preliminary injunction is granted, and the defendants are enjoined from enforcing the resolution adopted July 25, 1989.

The court has scheduled a status conference with counsel on February 14, 1990, at 1:00 P.M.